OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

*Massachusetts Housing Finance Agency. Housing. Constitutional Law,* Public purpose, Housing.

Under proposed legislation reciting the existence of a "serious shortage of decent, safe, and sanitary housing available at low rentals to persons of low income" and establishing the Massachusetts Housing Finance Agency as a "public instrumentality" to finance the private construction or rehabilitation of housing through low interest loans on mortgages, but making such housing available in substantial part to persons of "moderate income" as well as to persons of low income, the function of the Agency would not serve a public purpose and could not be constitutionally aided by the expenditure of money raised by taxation, even if the rents paid by persons of "moderate income" might subsidize lower rents paid by persons of low income. Per all the Justices except KIRK, J., who was of the opinion that the function of the Agency would serve a public purpose.

On July 18, 1966, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit their answers to the questions set forth in an order adopted by the House on July 6, 1966, and submitted to the Justices on July 7.

The questions relate to a pending bill, House No. 3696, entitled, "An Act providing for a Massachusetts Housing Finance Agency," which, apart from § 8A relating to "Capital Reserve Fund" and certain other modifications, substantially resembles appendix 5 to the final report of the special commission on low income housing, 1965 House Doc. No. 4040. The special commission was created pursuant to Res. 1964, c. 107, and the final report was dated April, 1965. There is a recital that grave doubt exists as to the constitutionality of the bill if enacted into law.

The bill comprises fifteen closely printed pages.

Section 1 contains definitions. One of these, subsection (e), defines ''low rentals'' as ''rent charges approximating those charged for public housing units.'' Another, subsection (g), defines ''moderate rentals'' as ''rent charges greater than public housing rents but less than those rents generally charged for newly built apartments of comparable size and location.'' By subsection (h) ''project'' means ''a number of apartment units constructed or rehabilitated with the assistance of a mortgage loan from the MHFA.''

Section 2, ''Declaration of Public Necessity.'' ''It is hereby declared that there exists in many cities and towns in the commonwealth a serious shortage of decent, safe, and sanitary housing available at low rentals to persons of low income, and that this shortage is inimical to the safety, health, morals and welfare of the residents of the commonwealth and the sound growth of the communities therein. The inadequate supply of such housing results in the continuing existence and proliferation of substandard and decadent housing, with all its attendant consequences of disease, crime, injuries, retardation of education, and high costs of municipal services such as police and fire protection. It will thus serve the public welfare to stimulate an increase in the supply of decent, safe and sanitary low-rent housing, not only insofar as it benefits those who live in such housing but in that such housing will materially assist communities in the prevention of crime, the improvement of education, the reduction of hazards from fire or structurally unsafe buildings, the improvement of the public health, a lowering of the cost of municipal services, and a betterment in the efficacy of certain welfare services. Private enterprise, without the assistance contemplated in this act, cannot achieve the construction of decent, safe and sanitary housing which is available at rentals which persons of low income can afford. It is, therefore, imperative that the cost of mortgage financing, which materially increases rental levels in the commonwealth, be lower so as to

materially reduce rental levels. A public exigency exists which makes the assistance contemplated by this act a public purpose, and the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination.''

Section 3. The Massachusetts Housing Finance Agency (MHFA) is created ''a body politic and corporate'' and placed in the department of commerce and development, but ''shall not be subject to the supervision or regulation'' of that department ''or of any department, commission, board, bureau or agency of the commonwealth except to the extent and in the manner provided in this act.'' The Agency is ''constituted a public instrumentality and the exercise by the MHFA of the powers conferred by this act shall be deemed and held to be the performance of an essential governmental function.'' MHFA is to consist of seven members, the chairman to be the commissioner of commerce and development; another, the commissioner of corporations and taxation; and five to be appointed by the Governor for staggered seven year terms.

The Agency is given these powers (§ 4) among others:

(a) Make first mortgage loans, including mortgages insured by the Federal Housing Commissioner, to finance the building or rehabilitation of housing planned to be available at low and moderate rentals for low and moderate income families upon terms ''spelled out'' in § 5.

(e) Execute contracts and other instruments.

(g) Enter into agreements or other transactions with any Federal or State agency.

(h) Acquire real property by purchase or foreclosure, where necessary or appropriate to protect any loan in which it has an interest; sell, transfer, and convey such property to a buyer; and lease to a tenant where a sale cannot be effected with reasonable promptness or at a reasonable price.

(j) Borrow by making notes and issuing bonds.

(m) Sell at public or private sale any mortgage or other obligation securing a mortgage loan, including mortgages to the Federal National Mortgage Association.

(p) Make and publish rules and regulations.

(q) Do all things necessary or convenient to carry out its purposes and exercise its powers expressly given.

(r) Accept gifts, grants, or loans of funds or property, financial or other aid.

Section 5, "Provisions of Mortgages," is three pages in length, and has eight subsections.

Subsection (a) "Purpose." "MHFA will make mortgage loans to sponsors of such multidwelling housing projects as in the judgment of the MHFA have promise of supplying well planned, well designed apartment units at low and moderate rentals in locations where there is a need for such housing." Both construction and permanent loans are included. Projects may embrace commercial facilities to the extent permitted by regulations of the Federal Housing Administration (FHA).

Subsection (b) "Eligible Mortgagor." "MHFA may make loans to individuals, joint ventures, partnerships, limited partnerships, trusts, corporations, cooperatives and condominiums, whether nonprofit or organized for profit."

Subsection (c) "Interest and Charges." "MHFA shall have authority to set from time to time the interest rates at which it shall make loans. It is a principal objective of this act, however, that the interest rate shall be as low as is consistent with making the MHFA a self supporting agency. To that end the MHFA shall not charge interest at a rate higher than one quarter of one per cent in excess of the market yield to maturity on the bonds of the MHFA sold with respect to the particular loans made." MHFA may make and collect such fees and charges, including but not limited to its financing costs, service charges, insurance premiums, mortgage insurance premiums, as it determines to be reasonable.

Subsection (d) "Limited Profit." A mortgagor may not make distributions in any one year in excess of six per cent of the mortgagor's equity, which "shall consist of the difference between the mortgage and the total project cost." Here follows a definition of "Total project cost." "With

respect to every project, the MHFA shall establish the mortgagor's equity at the time of the making of the final mortgage advance and for purposes of this sub-paragraph, that figure will remain constant during the life of the MHFA's mortgage on such project."

Subsection (e) "Use of Non-distributed Profits." "When a mortgagor accumulates earned surplus in addition to such reserves for replacement as the MHFA or the FHA may require in excess of ten per cent of the initial rent roll for the project, the excess surplus shall be used to reduce rents in the following fiscal year. Every ten years the mortgagor may seek the approval of the MHFA to an increase in the earned surplus account to the extent warranted, in the judgment of the MHFA, by increased price levels or unusual maintenance and repair requirements."

Subsection (f) "Amortization and Refinancing." The ratio of loan to project value and the amortization period of loans under this act which are insured by FHA shall be governed by the FHA mortgage insurance commitment for each project but shall not exceed fifty years. For a mortgage loan not insured by FHA the ratio and the amortization period shall be determined by the regulations of MHFA, but in no event shall the ratio exceed ninety per cent of project cost as determined by MHFA nor shall the amortization period exceed fifty years. In so far as permitted by FHA a loan may be prepaid after twenty years; but nonprofit sponsors may prepay their loans prior to maturity only with the consent of MHFA, which shall grant consent if it finds that (1) it may reasonably be expected that the prepayment of the loan will not result in a material escalation of rents charged to tenants in the project, and (2) the need for low and moderate rental housing in the area is no longer acute.

Subsection (g) "Rent Schedules." Subject only to the rights of FHA, rents must be approved by MHFA.

Subsection (h) "Tenant Selection." Prior to making a loan commitment MHFA shall approve a tenant selection plan submitted by the loan applicant. MHFA shall formulate regulations setting forth the criteria for such plans.

Criteria shall include income limits of tenants, which may vary with the size and circumstances of the family unit. Such income limits shall be sufficiently flexible to avoid undue economic homogeneity among the tenants of a project, but a tenant's income plus that of a spouse shall not exceed six times the basic rent (without accounting for any adjustment under § 6) of the unit and eight times that rent if the family unit has more than five dependents other than the spouse. The regulations may provide for the termination of occupancies of tenants whose incomes exceed certain limits or permit them to remain upon paying a rent which would reflect the carrying costs at normal mortgage interest rates rather than the below market rates provided in this act. First priority right to apartment units designated for rent at adjusted charges pursuant to § 6 is given to the housing authority of the municipality in which the project is located.

Section 6, "Adjusted Charges." "No less than twenty-five per cent of the apartment units in each project . . . shall be made available at adjusted charges, by which is meant rents lower than market conditions, financing requirements, or the rents to be charged for the other units in the project would indicate. The purpose of this section is to make at least twenty-five per cent of the units in each project available at low rents, as close to public housing rent levels as the fiscal integrity of the project will permit. To achieve such adjusted charges, the MHFA and a mortgagor may use devices including, but not limited to: direct rental assistance in the form of partial rent subsidy from a municipal, state, or federal source; allocation of lower rents to less desirable locations and apartments with less expensive facilities, such as less expensive flooring; and the raising of rents in the majority of apartments in the project in order to lower the rents of those in the adjusted charge category." Prior to initial occupancy MHFA shall prescribe the number of adjusted charge units and the rents, and "such allocation shall be subject to the concurrence of FHA." The allocation may be reviewed and adjusted at

five year intervals. The method of achieving adjusted charges shall be prescribed by MHFA subject to the concurrence of FHA.

Section 7, "FHA Requirements." "MHFA may vary the provisions of sections five and six hereof to the extent from time to time required by FHA."

Section 8, "Issuance of Bonds and Notes." MHFA shall have power to issue its negotiable bonds and notes "to provide sufficient funds for achieving its corporate purposes, including the making of mortgage loans, the payment of interest on bonds and notes," and the establishment of reserves.

Section 8A, "Capital Reserve Fund." The Agency shall create a special fund, known as the capital reserve fund, into which it shall pay (1) moneys appropriated by the Commonwealth for the fund; (2) the proceeds of sale of notes or bonds to the extent provided in the resolution of MHFA authorizing their issue; and (3) moneys made available for the fund from any other source. All moneys held in the fund, except as hereinafter provided, shall be used solely for the payment of the principal of the Agency's bonds, the purchase of its bonds, and the payment of interest or redemption premiums. Any income or interest earned by, or increment to, the capital reserve fund due to its investment may be transferred to the general funds of MHFA, provided the amount of the fund is not reduced below the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on all bonds of MHFA then outstanding.

"(c) In order further to assure maintenance of the capital reserve fund as hereinbefore provided, there shall be annually paid to the MHFA out of the General Fund of the commonwealth, and subject to appropriation by the General Court, such sum, if any, as shall be certified by the MHFA to the governor and the auditor of the commonwealth as necessary to restore the capital reserve fund to an amount equal to the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year

on the bonds of the MHFA then outstanding. The MHFA shall annually, on or before December first, make and deliver to the governor and auditor of the commonwealth its certificate stating the amount, if any, required to restore the capital reserve fund to the amount aforesaid.''

Section 9, ''Credit of Commonwealth or any Subdivision Thereof Not Pledged.'' Bonds and notes issued under this act shall not be deemed to constitute a debt or a pledge of the faith and credit of the Commonwealth or of any of its political subdivisions, but shall be payable solely from the proceeds of mortgage loans made under this act, reserve funds created therefor by MHFA, and any mortgage insurance contracts pertaining thereto.

Section 10, ''Trust Agreement,'' need not be summarized.

Section 11, ''Rights of Note and Bond Holders Not to be Impaired.'' ''The commonwealth does hereby pledge to and agree with the holders of any notes or bonds issued under this act, that the commonwealth will not limit or alter the rights hereby vested in the MHFA to fulfill the terms of any agreements made with the holders thereof, or in any way impair the rights and remedies of such holders until such notes or bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders, are fully met and discharged. The MHFA is authorized to include this pledge and agreement of the commonwealth in any agreement with the holders of such notes or bonds.''

Section 12, ''Working Capital Fund.'' ''To provide for the organizational and administrative overhead incident to the inception and early operations of the MHFA, the sum of two hundred thousand dollars is hereby appropriated from the General Fund of the commonwealth, which funds shall be paid to the MHFA and which sum the MHFA shall repay the commonwealth in ten annual installments beginning with the commencement of the sixth full year after the receipt of such funds.''

Section 13 provides that there is to be an advisory committee of fifteen appointed by the Governor.

Section 14, "Bonds and Notes Tax Exempt." "The commonwealth covenants with the purchasers and all subsequent holders and transferees of the notes and bonds issued by the MHFA, in consideration of the acceptance of any payment for the notes and bonds, that the notes and bonds of the MHFA, issued pursuant to this chapter and the income therefrom shall at all times be free from taxation."

Section 15, "Bonds and Notes Eligible for Investment," contains a broad provision making bonds and notes issued pursuant to this act legal investments.

Section 16 requires MHFA to make an annual report to the Governor and other State officials. By § 17 its books and records shall be subject to an annual audit by the auditor of the Commonwealth. The proposed act is to be liberally construed. § 18. Its provisions are severable. § 19.

The questions are:

"1. Does the granting by the agency established by said House, No. 3696 of low interest loans to private individuals, associations, or corporations for the purpose of financing the building or rehabilitation of housing designed and planned to be available at low and moderate rentals for low and moderate income families constitute a public purpose for which money raised by taxation may be expended as provided in subsection (c) of Section 8A of said House, No. 3696? (See *Opinion of the Justices*, 211 Mass. 624 cited in *Opinion of the Justices*, 332 Mass. 769).

"2. Does subsection (c) of Section 8 together with Section 11 of said House, No. 3696 constitute a pledge of the credit of the commonwealth, notwithstanding the statements contained in Section 9 that the credit of the commonwealth is not pledged for the payment of bonds and notes issued by the agency?

"3. If the answer to Question 2 is in the affirmative, does the proposed Bill violate the second sentence of Section 1 of Article LXII of the Amendments to the Constitution providing that 'The credit of the commonwealth shall not in any manner be given or loaned to or in aid

of any individual, or of any private association, or of any corporation which is privately owned and managed'?

"4. Subsection (c) of Section 8 of said House, No. 3696 provides in effect that there shall be annually paid to the MHFA out of the General Fund of the commonwealth and subject to appropriation by the General Court such sum as may be necessary to restore the capital reserve fund to an amount sufficient to pay the amount of principal and interest becoming due in any succeeding calendar year. Section 11 provides that the commonwealth will not limit or alter the rights vested in the MHFA so as to impair, in any way, the rights and remedies of the holders of the bonds or notes of said MHFA. Do the foregoing sections, when read together, constitute a compulsory annual appropriation in violation of Section 3 of Article LXIII of the Amendments to the Constitution?

"5. Does this Legislature in said subsection (c) of Section 8 and Section 11 bind or attempt to bind succeeding Legislatures so that they could not revoke or amend the pending legislation, if enacted into law, in violation of Chapter I, Section 1 of Article IV of the Constitution? (See *Opinion of the Justices*, 334 Mass. 721, 736).

"6. In said House, No. 3696 the General Court has delegated to the agency certain powers to determine (1) when and to whom to make mortgage loans, (2) rules and regulations respecting the grant of mortgage loans and the regulation of borrowers, (3) interest rates to be charged for mortgage loans, (4) rents to be charged for housing units receiving mortgage loans, and (5) tenant selection plans of the applicants for mortgage loans. In light of the purposes and provisions of the proposed legislation, the standards expressed and implied in such legislation and such judicial review as will be available, does the proposed legislation provide for an unconstitutional delegation of powers by the General Court to the agency with respect to such or other matters?

"7. May the General Court enact legislation providing in substance (see Section 11) that while any bor-

rowings by the MHFA remain outstanding, the powers, duties or existence of the said MHFA shall not be diminished or impaired in any way that will affect adversely the interests and rights of the lenders, in view of Article LIX of the Amendments which provides 'Every charter, franchise or act of incorporation shall forever remain subject to revocation and amendment'? (See *Opinion of the Justices,* 332 Mass. 769, 781).

"8. Would the enactment into law of said House, No. 3696 violate the 'equal protection of the laws' clause of the 14th Amendment to the Constitution of the United States?"

The first question is whether the granting by the Agency of low interest loans for financing the building or rehabilitation of housing planned to be available at low and moderate rentals for low and moderate income families would constitute a public purpose for which money could be raised by taxation as provided in § 8A (c). This section authorizes an annual payment out of the General Fund of the Commonwealth and "subject to appropriation" by the General Court of the sum certified by MHFA "as necessary to restore the capital reserve fund to an amount equal to the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on the bonds of the MHFA then outstanding."

This is not a bill aimed to clear blighted areas or to remove slums. There is no reference to a specific decadent area. Cases like *Papadinis* v. *Somerville,* 331 Mass. 627, and *Despatchers' Cafe Inc.* v. *Somerville Housing Authy.* 332 Mass. 259, are not applicable. See *Opinion of the Justices,* 332 Mass. 769, 780, 783–784. So far as we are aware, no decision of this court goes as far as would be necessary to uphold the bill. See *Opinion of the Justices,* 331 Mass. 771, 776–777.

The object of the bill is to provide multi-dwelling housing at "low" and "moderate" rentals "in locations where there is a need for such housing" (§ 5 [a]) by the creation of a State housing finance agency which, according to the

bill, is to provide mortgage loans at below normal rates. The interest charged shall be as low as is consistent with making the MHFA self-supporting and shall not be more than one quarter of one per cent in excess of the market yield to maturity on its bonds sold with respect to the particular loans made. § 5 (c). A mortgagor's distributed profit is limited in any one year to six per cent of the mortgagor's equity (§ 5 [d]), and a prescribed part of any surplus shall be used to reduce rents. § 5 (e).

The foundation of the plan is the economic standing of the beneficiaries, whose identity is not clearly described except that there are roughly two categories, one of persons of low income who are to pay rent charges approximating those charged for public housing units, and the other of persons of moderate income, who will pay higher rent charges but less than those generally charged for newly built apartments of comparable size and location. § 1 (g).

We are aware of the "Declaration of Public Necessity" in § 2. This is not a recital in the order of the House transmitting the bill to us. See *Opinion of the Justices,* 331 Mass. 771, 774. It is not a recital in a statute to which the courts will give weight whenever possible. *Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288, 293–294. *Lowell* v. *Boston,* 322 Mass. 709, 735. "In the rendition of an advisory opinion, however, there are no legislative findings. There is no presumption in favor of the validity of a proposed statute such as there is when we consider an enactment already in effect which comes before us in a real controversy involving the accrued rights of actual litigants." *Opinion of the Justices,* 337 Mass. 777, 781–782. But compare *Opinion of the Justices,* 320 Mass. 773, 779–780.

A statute which reasonably faces and seeks to overcome the emergency stated in § 2, namely, that "there exists in many cities and towns in the commonwealth a serious shortage of decent, safe, and sanitary housing available at low rentals to persons of low income," could be for a public purpose. The difficulty is that the bill does not do this.

Housing is to be furnished not merely to persons of low income but also to persons of "moderate income," § 4 (a), a term which is not defined. Tenants are to be selected so as "to avoid undue economic homogeneity." Income limits "may vary with the size and circumstances of the family unit." The highest income limit is six times the basic rent of the apartment occupied and eight times if the family unit includes more than five dependents other than the spouse. § 5 (h).

Not less than twenty-five per cent of the apartment units in each project shall be made available "at adjusted charges," which are rents lower than market conditions, financing requirements, or other rents in the project would indicate. The purpose is "to make at least twenty-five per cent of the units in each project available at low rents, as close to public housing rent levels as the fiscal integrity of the project will permit." To achieve the adjusted charges, MHFA and a mortgagor may use devices, such as partial rent subsidies from governmental sources, allocation of lower rents to less desirable apartments, and raising of rents in a majority of apartments in order to lower other rents. § 6.

The consequence is that as many as seventy-five per cent of the apartment units in each project could be given to persons not of low income. Neither § 2 nor any other section states or suggests any emergency as to housing for families of moderate income. Such families are undoubtedly the great bulk of families in the State who do not own their own homes and are not of low income.

Thus, so far as the purpose of the bill is to provide housing for families of moderate income, the bill does not appear to be confined to a public purpose. The possibility that the rents paid by moderate income families, possibly up to seventy-five per cent in a project, will subsidize lower rents paid by low income families is too indirect and uncertain to enable us to say that expenditures of tax money under this bill will be for a public purpose.

To Question 1, we answer "No."

We have reached this conclusion without considering the effect of § 7. This is a bald delegation of authority to FHA to vary the provisions of §§ 5 and 6, a delegation which is tantamount to an authorization to amend those sections as FHA might see fit. Doubtless this constitutional defect could be remedied by a change in phraseology.

Because of our answer to Question 1 we feel that we should refrain from answering the later questions. Advice upon important and novel constitutional questions should not be given as to a bill which, if it is to become valid, must be substantially revised. See *Opinion of the Justices,* 341 Mass. 738, 759. Accordingly, we respectfully request to be excused from answering Questions 2 to 8, inclusive.

> RAYMOND S. WILKINS
> JOHN V. SPALDING
> ARTHUR E. WHITTEMORE
> R. AMMI CUTTER
> JACOB J. SPIEGEL
> PAUL C. REARDON

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

As I read the bill, its purpose is to make available public funds to assist private enterprise in providing decent, safe and sanitary housing, either by the construction of new or the rehabilitation of old dwellings, to persons of low income at low rentals, in an environment voluntarily to be shared, perhaps predominantly, by persons of moderate income on suitable terms, and thus, hopefully, to reduce slum areas and, in addition, to avert the blight and decadence which swiftly descend upon subsidized housing where the environment consists almost exclusively of a low level economic group. This purpose, in my judgment, in the context of our times, is a public purpose.

The language of the first question rests, in my view, upon an erroneous construction of the bill. It imports into the

statement of the purpose matters which relate solely to the means of accomplishing the purpose. Since the question assumes a construction which is at variance with the provisions of the pending bill, a categorical answer to it would serve no purpose. I therefore ask to be excused from answering it.

The remaining questions, when read together, appear to be argumentative against the bill. The citation of opinions with the questions (in itself a novelty) is confined, so far as at all pertinent to the provisions of this bill, to opinions which said that bills were unconstitutional. The questions when read separately, in some instances, as for example 2, 5 and 7, omit or inaccurately state relevant provisions of the bill. For these reasons, and because of the interdependence of the questions, I respectfully ask to be excused from answering Questions 2 to 8, inclusive.

PAUL G. KIRK