MASSACHUSETTS HOUSING FINANCE AGENCY *vs.* NEW ENGLAND MERCHANTS NATIONAL BANK OF BOSTON & others.[1]

Suffolk.   May 8, 1969. — June 11, 1969.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Massachusetts Housing Finance Agency. Housing. Constitutional Law,*
Public purpose, Housing, Opinions of the Justices, Delegation of
powers, Expenditure of public money, Credit of the Commonwealth.

A question dealt with in an advisory opinion of the Justices, upon arising
in subsequent litigation, is considered by this court anew unaffected
by the previous opinion. [208]

A public purpose is served by the Massachusetts Housing Finance Agency
existing under St. 1966, c. 708, as amended by St. 1968, cc. 671, 709,
and 761, § 21, as "a body politic and corporate" authorized to make
mortgage loans at favorable interest rates enabling the borrowers to
furnish proper housing to low income tenants at low rentals, although
a substantial part of such housing may be occupied by moderate in-
come tenants at higher rentals, since any benefit to the moderate in-
come tenants is required to be minimal and merely incidental to the
purpose of furnishing the housing to the low income tenants [213–214];
a delegation by the statute of authority to the Agency to determine
various matters of importance in connection with the projects is cou-
pled with adequate standards for the making of such determinations
[214]; the provisions of § 9B (c) of the statute relative to appropria-
tions by the Commonwealth into the Capital Reserve Fund of the
Agency established to ensure payment of bonds issued by it consti-
tute, when read with § 9, merely a legislative statement of intention
and not a legally binding obligation of the Commonwealth [216]; it
was "constitutionally permissible" for the Legislature to make such
statement of intention [218]; and it would be within the power of the
Legislature to make such appropriations into the Capital Reserve
Fund as in aid of the public purpose of the Agency [218].

BILL IN EQUITY filed in the Supreme Judicial Court for
the county of Suffolk on April 8, 1969.

---

[1] The other defendants are National Shawmut Bank of Boston and Boston
Safe Deposit and Trust Company.   The docket shows that the Attorney
General filed an acknowledgment of notice on April 8, 1969.   See G. L.
c. 231A, § 8.

The suit was reserved and reported by *Reardon, J.*

*John F. Bok* for the plaintiff.

*Joseph W. Bartlett* for the defendants.

*Clarence A. Roberts, David M. Roseman, Thomas J. Gallagher, Jr., & Harley M. Smith,* for Greater Boston Real Estate Board, amicus curiae, submitted a brief.

*George M. Hughes & James W. Perkins,* for Interfaith Housing Corporation & another, amici curiae, submitted a brief.

CUTTER, J. The plaintiff (MHFA) brings this bill for declaratory relief to determine whether two conditions (see fn. 7, *infra,* and related text of this opinion) of a purchase and sale agreement made by MHFA with the defendants (the banks) have been met. The banks' answer admits the allegations of the bill. It is stipulated in effect that the pleadings may be treated as constituting a case stated. The case was reported without decision by the single justice.

MHFA is "a body politic and corporate" established by St. 1966, c. 708, as amended by St. 1968, cc. 671, 709, and 761, § 21.[2] Section 5 (a) of the Act purports to authorize MHFA to make first mortgage loans to such sponsors of multi-dwelling projects as in MHFA's judgment, "have promise of supplying well planned, well designed apartment units which will provide housing for low income persons or families in locations where there is a need for such housing."[3] MHFA has "issued commitments [which have been accepted] to provide construction and permanent mortgage financing to . . . four applicants." Two of these (Interfaith Housing Corporation of Cambridge and Interfaith Housing Corporation) are nonprofit corporations organized under G. L. c. 180. One is a limited dividend corporation.

---

[2] Collectively these statutes, as amended, are referred to in this opinion as the Act.

[3] This provision of § 5 (a) differs somewhat from § 4 (a) which authorizes MHFA (emphasis supplied) to "[m]ake first mortgage loans . . . to finance the building or rehabilitation of housing designed and planned to be available at low and moderate rentals for low income persons and families *and others* upon the terms set forth in" § 5.

One is a limited dividend partnership.  Each applicant is attempting to carry out a housing project.[4]  MHFA has adopted somewhat imprecise, general regulations governing rental determinations, see § 6 (a) of the Act, and the terms of tenant selection plans.[5]  Section 7 (a) of the Act, requires plans to contain criteria[6] and income limits for tenant selection "which may vary with the size and circumstances of the" applicant family and its income.  Section 7 (a) also provides that "income limits shall be *sufficiently flexible* to avoid undue economic homogeneity among . . . tenants . . . , but *for the purpose of initial selection*, the annual income of the applicant shall not exceed five times the annual rental for the unit to be occupied" (emphasis supplied). Section 7 (b) provides that annually "tenants whose . . . incomes . . . increase" so that they "exceed six times the rental then being charged . . . shall have . . . [their]

---

[4] Typical of the projects (see also fn. 11, *infra*) is that of Interfaith Housing Corporation of Cambridge (nonprofit), which has a commitment for a $5,852,200 loan for a 260 dwelling-unit housing project consisting of a high rise 100 dwelling unit building primarily for elderly persons with lower buildings primarily for families with children.  Because of two urban renewal projects in Cambridge and certain proposed highway extensions, the shortage of Cambridge housing for low income families has become acute.  Neither the public housing program nor private enterprise has been able to meet this housing need and there has been agitation for municipal rent control.

[5] The regulations, based on definitions in § 6 of the Act, require each applicant for MHFA financing to recommend MHFA determinations for use in its project as follows: "a. *Market rate rental* . . . current market interest rates and mortgage terms as determined from time to time by the [e]xecutive [d]irector [of MHFA].  b. *Below-market rate rental* . . . the market rate rental adjusted for the extent to which the current . . . [MHFA] borrowing rate . . . is below current market interest rates and mortgage terms.  c. *Adjusted rental* . . . the below-market rate rental adjusted down ten percent.  d. *Actual Project Rental* . . . the rent actually to be charged.  At least twenty-five percent of the units shall have actual project rentals below the adjusted rentals for the unit.  e. *Subsidized rental* . . . the actual rental, reduced by the amount of any [Federal] Section 236 rental supplement or rental assistance payment being applied for."

[6] The regulations (largely in the language of § 7 of the Act) also provide tenant selection criteria.  "Maximum limits on the annual income of an applicant, for . . . initial selection, may not exceed 5 times the annual rental for the unit to be occupied."  As between eligible applicants equal in need, preference is to be given to persons displaced by public action or natural disaster.  The local housing authority may designate eligible tenants for "adjusted rental" units, as such units become available.  Each project's plan is to provide eligibility standards which will "ensure that the public interest is served without favoritism, partiality, or arbitrariness."

356 Mass. 202                                                   205

Massachusetts Housing Finance Agency *v.* N. E. Merchants National Bank.

rental . . . increased to a figure (not in excess of the market rate rental) which will equal one-sixth of the tenant's then net annual income."

To raise funds required during the coming twelve months period, MHFA arranged to sell to the banks $7,000,000 temporary MHFA notes to be issued pursuant to § 8 of the Act. On April 7, 1969, the banks notified MHFA that they would not accept delivery of the notes and transmitted to MHFA a copy of an opinion of the banks' counsel which (doubtless largely on the basis of *Opinion of the Justices,* 351 Mass. 716) raises serious doubt about the constitutional validity of the Act.

The agreement for the sale of the notes provided, among other things, that the "obligations of . . . [MHFA] to issue . . . and the . . . [banks] to purchase the [n]otes are subject to" various conditions, the most important of which is "(1) [t]hat the [n]otes, when issued, shall be valid obligations of . . . [MHFA] enforceable in accordance with their terms and duly authorized by the Act and the Constitution of The Commonwealth." Condition (2) is somewhat similar [7] and calls for assurance that certain conditional assistance from future appropriations to ensure the repayment of MHFA's notes will be constitutionally permissible.[8]

In considering the banks' refusal to accept the notes consideration must be given to somewhat complicated, interdependent provisions of the Act in addition to those already

---

[7] Condition (2) reads, "That . . . [MHFA] shall have, by the . . . [authorizing] resolution, lawfully undertaken to issue renewal notes to pay any unpaid balance of the [n]otes or of any renewal notes . . . or to issue bonds to pay such unpaid balance, which bonds, as and when issued, shall have the benefit of the security of the Capital Reserve Fund [see § 9B of the Act], as augmented, if necessary, by such annual state assistance as is required to be appropriated (upon proper certification) by section 9B (c) of the Act [see fn. 13, *infra*]; that said section is a constitutionally permissible statement of intention on the part of the Commonwealth, whether or not . . . a legal obligation, to augment the Capital Reserve Fund, if necessary, by such assistance; and that the carrying out by the Commonwealth of such intention is constitutionally permissible."

[8] The provision for possible appropriations to assist MHFA's repayment of its obligations is found in § 9B (c) of the Act and is discussed later in this opinion (see part 3 and fn. 13, *infra*).

mentioned. Among these is § 2 of the Act [9] (entitled "Declaration of Public Necessity"), much relied on by MHFA as justifying the scheme adopted to carry out the Act's purpose. The basic purpose of the Act is expressed in the final sentence of § 2, viz. "It is . . . imperative that the cost of mortgage financing, which materially affects rental levels . . . be made lower so as to reduce rental levels for . . . low income . . . families, that . . . housing for . . . families displaced by public action or natural disaster be increased, and that private enterprise be encouraged to build housing which will prevent the recurrence of slum conditions . . . by housing persons of varied economic means in the same projects . . . ."

The Act in § 1 (d) defines "low income persons or families" as "those . . . whose annual income is less than the amount necessary to enable them to obtain . . . decent, safe and sanitary housing without the expenditure of over twenty-five per cent of such income for basic shelter rent plus the additional cost . . . of heat and hot water." Any precision in § 1 (d) is somewhat reduced by the definition of "[a]nnual income" in § 1 (e) as "a family's or person's gross annual income less such reasonable allowances for dependents (other than spouse) and for medical expenses as MHFA determines." See, however, fn. 12, *infra*.

By § 5 (b) MHFA is authorized to make loans to mortgagors "whether nonprofit or organized for profit" and may

---

[9] Section 2 reads in part (emphasis supplied): "It is . . . declared that as a result of public actions involving highways, public facilities and urban renewal . . . , and as a result of the spread of slum conditions and blight to formerly sound neighborhoods, there now exists . . . an acute shortage of decent, safe and sanitary housing available at low rentals which . . . families of low income, elderly persons and veterans . . . can afford. . . . The continued inadequacy of . . . such housing inhibits . . . needed slum clearance projects and results in the . . . proliferation of sub-standard and decadent housing, with . . . consequences of disease, crime, injuries, retardation of education, and high costs for municipal services . . . . *This public exigency . . . has not been met . . . by private agencies.* Private enterprise, without the assistance contemplated in this act, cannot achieve the construction of decent, safe and sanitary housing at rentals which . . . families of low income can afford in situations where permanent betterment of living conditions is to be hoped for. . . . [*C*]*oncentration of low income persons . . . even in standard structures built with public subsidy does not eliminate undesirable social conditions and . . . permanently eliminate slum conditions.*" Then follows the language of § 2 quoted in the body of this opinion.

356 Mass. 202                                                    207

Massachusetts Housing Finance Agency *v.* N. E. Merchants National Bank.

set its interest rates and charges. See § 5 (c). The Act, § 5 (c) and (d), contains provisions to limit the profit received by mortgagors. Prior to making a loan commitment, see § 5 (g), MHFA must make the findings described in the margin.[10] By § 6 (b) it is provided that in "each project financed . . . not less than twenty-five per cent of the units . . . shall be rented at all times to low income . . . families at the adjusted rental. [See fn. 5.] The remaining units . . . shall be made available at rentals not lower than the below-market rental for the unit and sufficiently high as determined by MHFA to achieve and maintain a fiscally sound project." Section 6 (c) directs that "rentals received . . . in excess of the below-market rental . . . shall be applied, pursuant to . . . [MHFA] regulations . . . to reduce rentals from the below-market rental [see fn. 5] to achieve and reduce adjusted rentals" for low income persons.

Section 8 of the Act permits MHFA to issue negotiable bonds and notes to carry out its corporate purposes upon terms and conditions which need not be stated in detail. By § 12 it is stated that MHFA "will be performing an essential governmental function" and that the Commonwealth "covenants with . . . holders . . . of the notes and bonds . . . that the [MHFA] notes and bonds . . . and the income therefrom shall at all times be free from taxation." Later in this opinion (see part 3) there is discussion of § 9 of the Act which provides that the credit of the Commonwealth and its subdivisions shall not be deemed to be pledged.

The banks contend that the Act is invalid, and hence that

---

[10] The findings, see § 5 (g), include "(1) that low income . . . families can afford the adjusted rentals [see § 6 of the Act, and fn. 5, *supra*] set for twenty-five per cent of the units in the proposed project on the basis of the use of not more than twenty-five per cent of annual income, (2) that there exists a shortage of decent . . . housing at low rents available to . . . families of low income within the general housing market area to be served . . . (3) that private enterprise without the [Act's] assistance . . . cannot supply such housing, and (4) that programs of public agencies within the general housing market area to be served by the project have accomplished or will accomplish within the next five years the elimination . . . of unsafe or unsanitary dwelling units . . . within such market area substantially equal in number to the number of units to be provided by such project" subject to provisos and exceptions not here pertinent.

the conditions precedent (see fn. 7) to their obligation to purchase the MHFA notes have not been met, for three principal reasons, viz. (1) that the Act is not supported by any proper public purpose within Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth, at least to the extent that the Act affords rental benefits to families of moderate income; (2) that unduly broad legislative powers have been delegated to MHFA without the provision of proper standards to govern their exercise; and (3) that § 9B (c) of the Act (see fn. 13, *infra*) improperly requires the Legislature to make appropriations in future years in certain specified circumstances. We discuss below each of these contentions.

We recognize, of course, that the Act resembles the bill (1966 House Bill No. 3696; see 1965 House Doc. No. 4040) considered by the Justices in *Opinion of the Justices,* 351 Mass. 716. See 1966 Ann. Surv. Mass. Law, § 15.38; note, 80 Harv. L. Rev. 1811. A majority of the Justices there advised (p. 728) that, "[S]o far as the purpose of . . . [that] bill is to provide housing for families of moderate income, the bill does not appear to be confined to a public purpose. The possibility that the rents paid by moderate income families, possibly up to seventy-five per cent in a project, will subsidize lower rents paid by low income families is too indirect and uncertain to enable us to say that expenditures of tax money under this bill will be for a public purpose."

When called upon, as we are now sitting as a court, to deal again with questions once considered in our advisory capacity, we regard it as our duty to consider the issues anew and to guard against any influence which might arise from the prior advisory consideration of the same questions. See *Perkins* v. *Westwood,* 226 Mass. 268, 271–272; *Dodge* v. *Prudential Ins. Co.* 343 Mass. 375, 379–380. Our advisory opinions, as the *Perkins* case indicates, are not "binding authorities," but are "open to reconsideration and revision" (see also *Lowell Co-op. Bank* v. *Co-operative Cent. Bank,* 287 Mass. 338, 345), particularly when (as in the present in-

356 Mass. 202                                        209

Massachusetts Housing Finance Agency *v.* N. E. Merchants National Bank.

stance) the legislative proposals, once considered in an advisory capacity, have been subsequently modified and clarified.

1. The intention of the complex statutory provisions of the Act is to make available mortgage financing at favorable interest rates to housing projects in which, in general, one quarter of the tenants will be in the "low income" category and the other tenants will be of moderate income. The lower interest rates will be achieved (a) by having MHFA borrow on a favorable basis by giving its bonds or notes, which are to be exempt from all Massachusetts property and income taxes and presumably also from current Federal income taxes, thus (b) permitting MHFA to lend to a borrower from it at interest lower than those which would be charged if the borrower were to obtain funds in the general mortgage market. The saving in interest is to be applied in part (but not entirely[11]) to making possible lower rentals to "low income" tenants, who may also receive the benefit of rent subsidies from a program conducted under § 236 of the Federal Housing and Urban Development Act of 1968, 12 U. S. C. § 1715 z–1, added by Pub. L. 90–448, Title II, § 201 (a), 82 Stat. 498.

---

[11] For example, for the project in Cambridge (fn. 4, *supra*), of the ninety-six one-bedroom (BR) units available fifteen will be for low income families. Also, forty 4 BR and ten 5 BR units will be available to low income families. For such units the various levels of rentals as determined (in the first three categories) by MHFA are:

| *Rental Rate* | *1 BR* | *2 BR* | *3 BR* | *4 BR* | *5 BR* |
|---|---|---|---|---|---|
| (1) Market | $187 | $193 | $242 | $274 | $317 |
| (2) Below Market | 165 | 170 | 213 | 241 | 280 |
| (3) Adjusted Rental[i] | 148 | 153 | 192 | 217 | 251 |
| (4) Actual Proposed Rental: | | | | | |
| a) for 25% of units [ii] | 104 | none | none | 189 | 197 |
| b) for others | 180 | 206 | 225 | none available | |

[i] Below Market rate less ten per cent.

[ii] Rate available to low income families whose income, after allowances for dependents and medical expenses, see § 1 (e), cannot exceed for the tenant of a 1 BR apartment $4,992, or $9,072 for the tenant of a 4 BR apartment, or $9,456 for the tenant of a 5 BR apartment. See fn. 10, *supra*.

It will be observed that rentals to others than low income families are to be at or near the market rental rate. In the other three projects some rentals to others than low income families may involve a somewhat greater downward variation from the market rental figure.

If the present projects (see fn. 11) are fair examples of the savings in interest available to a project owner from MHFA financing, most of that saving will be applied to the reduction of rents payable by low income families, although there may be also smaller reduction, below general market levels, of rents for moderate income tenants. The rent for any moderate income tenant, however, will not be allowed, under § 7 (b) of the Act already quoted in part, to fall below one sixth of the tenant's net annual income for the time being (or the fair market rental, whichever is lower). Thus the Act itself provides for upward rent adjustments for moderate income tenants to prevent their receiving any undue part of the benefit of MHFA financing.

Despite the precautions taken in the Act to minimize benefits to tenants of moderate income, the question inevitably arises whether MHFA's lending (at lower than market interest rates) of money borrowed on tax exempt notes is for other than a public purpose because part of the housing and rent saving accrues to persons of moderate income not within the low income group usually regarded as suitable objects of public support. Also, § 9A (b) of the Act appropriated to MHFA a sum, repayable by MHFA, to provide for initial expenses and by § 9B (c), see fn. 13, infra, continuing legislative appropriations to the Capital Reserve Fund are at least contemplated.

The use of public funds "in a rational manner toward the elimination of slums" by the provision of "low-rent housing for families of low income (not paupers)" was held permissible in *Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288, 292–296, where (at pp. 292–293) Qua, J. suggested various factors to be considered in determining whether an expenditure was proper or improper. Slum clearance or the clearance of blighted areas has been a factor supporting urban renewal laws and urban redevelopment. See *Papadinis* v. *Somerville,* 331 Mass. 627, 630–632; *Bowker* v. *Worcester,* 334 Mass. 422, 428–430; *Opinion of the Justices,* 341 Mass. 760, 776–777; *Dodge* v. *Prudential Ins. Co.* 343 Mass. 375, 383. See also *Opinion of the Justices,*

334 Mass. 760, 763–764; *Moskow* v. *Boston Redevelopment Authy.* 349 Mass. 553, 561; *Opinion of the Justices*, 354 Mass. 779, 785–786. We assume (without deciding) that some of the constitutional difficulties mentioned in *Opinion of the Justices*, 211 Mass. 624, 626, 629–630, may have been obviated by art. 43 of the Amendments to the Constitution of the Commonwealth.

The use of public funds to provide housing for veterans (*Opinion of the Justices*, 320 Mass. 773, 781) and for needy, elderly persons (*Opinion of the Justices*, 331 Mass. 771, 776–777) has been sustained. We stated in *Opinion of the Justices*, 351 Mass. 716, 727, that the provision of proper housing available at low rentals to persons of low income "could be for a public purpose." As we then read the proposed legislation, however, we concluded that the bill was not confined to such a purpose because (p. 728) "as many as seventy-five per cent of the apartment units in each project could be given to persons not of low income."

It is urged upon us by MHFA, in effect, that the Act is intended (see § 2 and fn. 9, *supra*) to accomplish slum clearance more effectively and more permanently than in earlier subsidized public housing by avoiding undue concentration of low income tenants and by achieving for such tenants "exposure to and close contact in as many areas as possible with more successful members of society." The Legislature, so MHFA contends, has made a "determination to proceed with . . . housing . . . low income families in projects also inhabited by those somewhat more affluent." It is also argued by MHFA that "families with middle class property standards are more likely to . . . assist in maintaining reasonable standards of . . . property upkeep which will . . . instruct low income families . . . in how to take care of housing and . . . insure that the project's basic value will not be radically lowered by tenant abuse."

After stating that the upward adjustment of "rentals . . . on three units . . . to obtain a sufficient 'subsidy' . . . enable[s] the fourth unit to be made available for low income persons," MHFA makes the following contentions.

"To the extent that the higher rental in these units will be below what the free market would charge, a necessary inducement will be provided to families not of low income to live together with low income . . . families in the project. . . . [T]his inducement . . . [may] counteract the fact that people do not normally choose to live in projects or neighborhoods with people of substantially lower incomes . . . [or] to 'subsidize' lesser rents charged in other units to make this possible. It is this mixing of families of varied economic means which will provide for the prevention and hence 'permanent elimination' of slum conditions in the project, which was expected in . . . [earlier] days . . . to occur simply through the construction of low-rent housing." Some of these contentions were made in substance in 1965 House Doc. No. 4040, pp. 37–41, upon which was based the bill considered in the 1966 advisory opinion (351 Mass. 716).

It is not for this court to consider whether these contentions are sound as a matter of economics and public policy. That is a legislative matter. Our duty is merely to consider whether the Legislature reasonably could consider them to be valid and could rationally regard the provisions of proper housing for low income families as the fundamental purpose of the Act and any benefits to persons of moderate income as only incidental to the primary objective, although contributing to its achievement. We are of opinion that the Legislature may properly enact legislation which proceeds on the basis of the considerations for which MHFA contends.

We have taken into account the changes in the 1966 bill which were made after our advisory opinion concerning it (351 Mass. 716). Although more precise standards for, and more effective limitation of, MHFA loans appropriately could have been imposed, material improvement of the original 1966 bill has been achieved. We mention some improvements in the margin.[12] The most important change

---

[12] Among the changes from 1966 House Bill No. 3696 found in the Act are the following: Section 1 (d) now contains a reasonably clear and objective definition of the term "low income persons or families," although, as already noted, it is made somewhat indefinite by § 1 (e) which loosely defines "[a]nnual income." We have been told, however, that MHFA on March 25, 1969, has

356 Mass. 202                                         213

Massachusetts Housing Finance Agency *v.* N. E. Merchants National Bank.

for present purposes is the insertion of new § 5 (g) requiring findings by MHFA. See fn. 10, *supra.* This provision we interpret as designed to ensure, among other things, that low income families will obtain substantial benefit from each project and that (with stated exceptions) each project will be matched within a reasonable time by public agency elimination of an equal number of substandard units. To this extent slum clearance and elimination is thus added to the other objectives of the Act.

The Act appropriately might have provided specifically that rents for tenants other than low income persons or families should not be fixed below the market rent level for comparable property by more than the minimum amount found by MHFA to be necessary to induce suitable persons of moderate income to occupy apartments in a project where the mixture of tenants may be extremely diverse. We, however, regard such a requirement as reasonably implied in the general provisions and structure of §§ 5, 6, and 7 of the Act. See e.g. § 6 (c), already quoted in part. The existence of this implied requirement in some degree is confirmed by MHFA's own application of the standards of these sections in approving the four projects for which commitments have been made. We thus conclude that the standards, expressly stated or implied in the Act, effectively require MHFA (a) to restrict loans under the Act to such projects as are of substantial benefit to low income persons

---

appropriately determined the amount of "reasonable allowances for dependents" in the light of "allowances granted by various public agencies under comparable . . . programs." MHFA thus recognizes that, in fixing such allowances, it must take into account available and reasonable criteria concerning the size of such allowances. Certain obscure definitions of the 1966 bill have been removed. A less imprecise declaration of public necessity (see fn. 9, *supra*) has been substituted in § 2. Under a new form of § 5 (g) MHFA must make specific findings in effect (a) that each project will carry out the objectives of the Act for the benefit of low income families, and (b) that (see new form of § 5 [g] [4]) an equivalent number of substandard housing units in the same general housing area will be eliminated. More adequate provisions governing rental levels and tenant selection have been substituted for unsatisfactory provisions of the original 1966 bill. An unduly broad delegation of power to MHFA contained in old § 7 no longer appears. Section 9B (c) of the Act (see fn. 13) is changed from the corresponding provision (see § 8A) of the original 1966 bill. The Act does not contain § 11 of the original 1966 bill, purporting to impose certain restrictions on future legislative action. See 1966 House Bill No. 3985.

and families; and (b) to make sure that any benefit to tenants not within the low income category will be at most incidental to, and no greater than is necessary for, achieving the Act's primary objective of proper housing in appropriate surroundings of persons of low income.

2. What has been said largely disposes of the banks' contention that there has been improper delegation of authority with respect to tenant selection and determination of what constitutes low income. Section 1 (d) of the Act lays down a reasonable standard. That standard may not properly be defeated by any unwarranted MHFA determination under § 1 (e) of "reasonable allowances for dependents . . . and for medical expenses." The Act obviously intends that each such determination shall be consistent with similar allowances by other public agencies, with general current standards of expenditure in the community, and with the apparent objective to restrict the term "low income persons or families" to persons genuinely requiring assistance in obtaining proper housing because of poverty.

The standards for arranging the terms of MHFA loans to projects might have been stated with greater definiteness. Nevertheless, it is reasonably apparent from the Act what those standards are. See *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.* 348 Mass. 538, 544–553. Loan terms are to be set on a basis which will tend to achieve as fully as possible the objectives of the Act in providing low cost housing for low income families. Obviously too burdensome terms to project borrowers will tend to defeat those objectives by keeping rents high. If terms are too favorable to such borrowers, however, any excess profits must be applied to rent reductions in accordance with § 6 (c), dividends will be restricted under § 5 (d), and by § 5 (e) the use of nondistributed profits will be regulated. The structure and general provisions of the Act make it plain that MHFA must so subject borrowers to regulation by the terms of loan agreements and by appropriate regulations under § 4 (p) as to ensure that project expenses are appropriately restricted, that accounting is accurate and informative,

and that each project realizes no more in profit and earnings than is contemplated by the Act and is so conducted as to achieve the Act's objectives for the benefit of low income families.  It may be significant that § 15 of the Act requires an annual audit of MHFA by the State Auditor.

3. The second condition precedent to the banks' obligation to accept the MHFA notes (see fn. 7, *supra*) includes the requirement that § 9B (c) of the Act (see fn. 13, *infra*) be "a constitutionally permissible statement of intention on the part of the Commonwealth . . . to augment the Capital Reserve Fund, if necessary, by . . . assistance" from appropriations.  Whether this aspect of the second condition has been satisfied depends upon consideration of the provisions of § 9 and § 9B (c) of the Act.

At a first reading these sections appear to be in conflict with each other.  Section 9 provides that MHFA's bonds and notes "shall not . . . constitute a *debt* of the commonwealth or of any political subdivision thereof *or a pledge of the faith and credit of the commonwealth* or of any such political subdivision, but such bonds and *notes shall be payable solely from the proceeds of mortgage loans* made under this act, *reserve funds created* therefor *by the MHFA*, and any mortgage insurance contracts pertaining thereto" (emphasis supplied).  Section 9B (c), set out in the margin[13] was inserted by St. 1968, c. 709, § 4.  The question thus is presented

---

[13] Section 9B (c) reads (emphasis supplied):  "(c) To assure the continued . . . solvency of . . . MHFA . . . provision is made in . . . [§ 9B (a)] for the accumulation in the Capital Reserve Fund of an amount equal to the maximum amount of principal and interest . . . becoming due in any succeeding calendar year on all bonds of . . . MHFA then outstanding.  In order further to assure such maintenance of the Capital Reserve Fund *there shall be annually appropriated and paid to* . . . *MHFA* for deposit in the Capital Reserve Fund such sum, if any, as shall be certified by the chairman of . . . MHFA to the governor as necessary to restore the Capital Reserve Fund to an amount equal to the maximum amount of principal and interest . . . becoming due in any succeeding calendar year on the bonds of the MHFA then outstanding.  The chairman of . . . MHFA shall annually . . . deliver to the governor his certificate stating the amount, if any, required to restore the Capital Reserve Fund to the amount aforesaid and *the amount so stated, if any, shall be appropriated and paid to* . . . MHFA during the then current *fiscal year* of the commonwealth.  Such amount, if any, shall be repaid to the commonwealth as soon as possible by . . . MHFA from" sources specified in § 9B (c).  For the 1968 legislative history, see 1968 House Doc. No. 3800, App. B; 1968 House Journal, pp. 2069, 2094; 1968 Senate Journal, p. 1615.

whether § 9B (c), especially the italicized language (a) imposes on the Legislature any binding obligation to make appropriation of funds as therein provided or (b) is merely a legislative statement of intention, not amounting to a legal obligation, as the parties and one of the amici curiae suggest in their briefs. If the latter meaning is correct, there is no inconsistency between § 9 and § 9B (c).

Borrowing by MHFA, an independent authority, does not involve a pledge of the Commonwealth's credit. See *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.* 348 Mass. 538, 556; *Opinion of the Justices*, 354 Mass. 779, 784-785. We interpret § 9 as precluding MHFA from giving any assurance that the Commonwealth is bound to, or will in fact, contribute by appropriation to the MHFA capital reserve fund in later years. The declarations in § 9 indicate to us that § 9B (c) was not intended to constitute any form of legislative commitment to make an appropriation to the capital reserve fund in any later year, even if one Legislature could make such a commitment for another, a matter which we have not considered and do not discuss. The section does not make any present appropriation. At most, § 9B (c), read with § 9 and as a matter of statutory interpretation, constitutes only an expression of a future intention or expectation which has no legally binding effect. It is also significant that a portion of § 9 of the Act, not quoted above, expressly directs that all MHFA's "bonds and notes shall contain on . . . [their] face . . . a statement . . . that neither . . . MHFA nor the commonwealth . . . shall be obligated to pay the same or the interest thereon except from . . . proceeds [of mortgage loans made under the Act], reserve fund or mortgage insurance contracts and that neither the faith and credit nor the taxing power of the commonwealth or any . . . subdivision thereof is pledged to the payment of the principal or the interest on such bonds."[14]

---

[14] It is urged upon us that the statement of intention in § 9B (c) is a valid intermediate form of credit, lying between (a) an enforceable pledge of State support or guaranty and (b) denial of any such support or silence on the subject. The circumstance that St. 1968, c. 709, inserted § 9B (c) in the Act

356 Mass. 202                                                          217

Massachusetts Housing Finance Agency *v.* N. E. Merchants National Bank.

In view of our interpretation of §§ 9 and 9B (c) no pur-
chaser or holder of MHFA's bonds or notes has any basis
whatsoever for relying to any extent on any appropriation
under § 9B (c) by the present or any subsequent Legislature,
despite the amorphous legislative declaration of intention to
make appropriations found in that section.   Cf. *Maryland
Indus. Dev. Fin. Authy.* v. *Meadow-Croft*, 243 Md. 515,
521–526; *Maryland Indus. Dev. Fin. Authy.* v. *Helfrich*,
250 Md. 602, 609–621.   We see no likelihood of special cir-
cumstances which would create for the benefit of any bond-
holder or noteholder[15] anything in the nature of a "moral
obligation" upon the Legislature to appropriate any funds
at all pursuant to its statement of intention in § 9B (c).
The situation seems plainly distinguishable from that con-
sidered in *Williamsburgh Sav. Bank* v. *State*, 243 N. Y. 231,
244–249.   There is no occasion to consider whether, upon the
precise facts of that case, we would be guided by it.   Be-
cause MHFA's bondholders would not have the slightest
claim to enforce, or to rely upon, any appropriation under
§ 9B (c), any appropriation in fact made would necessarily
have some aspects of a "gratuity" to them.  See *Eisenstadt* v.
*County of Suffolk*, 331 Mass. 570, 572–574; *Paddock* v.
*Brookline*, 347 Mass. 230.   See also *James* v. *Mayor of New
Bedford*, 319 Mass. 74, 76.   Cf. *Opinion of the Justices*, 320
Mass. 773, 780–781; *Opinion of the Justices*, 354 Mass. 799.

That bondholders may receive a benefit which they cannot
enforce does not mean that the Legislature lacks power to
make an appropriation.   If any Legislature should see fit to
make appropriations under § 9B (c), such appropriations,

by a recorded vote of two-thirds of the yeas and nays in each house (see
Senate Journal, p. 1722;  1968 House Journal, p. 2380), does not convince us
that the Legislature intended any form of pledge of the Commonwealth's
credit, intermediate or otherwise.

[15] By 9B (a) of the Act, the Capital Reserve Fund may be used solely for
the payment of principal, interest, and redemption premiums on MHFA's
bonds, and the purchase of such bonds.   By § 8 (a) MHFA is authorized to
issue notes as well as bonds, but § 8 (b) provides that the maturity of any
note or renewal note shall not be more than five years "from the date of issue
of . . . [the] original note."   Thus noteholders apparently would benefit
from the statement of intention to appropriate found in § 9B (c) principally
from whatever vague help that statement might give to the sale of MHFA's
bonds issued to refund notes.

indirectly at least, will be in aid of the public purpose underlying housing projects for which, under the safeguards in the Act, appropriations lawfully may be made. If there were to be a default under MHFA's bonds, and a legislative failure to carry out the expressed (but not binding) intention set forth in § 9B (c), the credit of the Commonwealth and its political subdivisions conceivably might be injured in some degree. The ability of MHFA to effect later borrowings for proper public purposes might well be adversely affected, thus making its subsequent operations more difficult. Although we hold that no obligation or duty whatsoever exists to make any appropriation in accordance with § 9B (c), we think that such an appropriation, if made, will be valid and "constitutionally permissible." We think also that it was "constitutionally permissible" for the 1968 Legislature to make the statement of intention contained in § 9B (c) although its members knew, or should have known, that the statement had and was intended to have no binding effect and said just that in § 9 of the Act.

4. For the reasons stated, the first and second conditions precedent to the banks' obligation to purchase MHFA's note have been satisfied. None of the matters argued indicates any sound ground upon which the banks may refuse to make the purchase.

5. A final decree is to be entered declaring that the banks are bound to purchase MHFA's notes in accordance with their agreement.

*So ordered.*