## Opinion of the Justices to the House of Representatives.

The Legislature have no power to authorize the use of money of the Common-
wealth, or of money deposited in the treasury of the Commonwealth by sav-
ings banks under St. 1908, c. 590, § 56, to purchase land, and develop, build
upon, rent, manage, sell and repurchase it, for the purpose of "providing homes
for mechanics, laborers or other wage-earners," or "for the purpose of improv-
ing the public health by providing homes in the more thinly populated areas
of the State for those who might otherwise live in the most congested areas of
the State."

The following order was passed by the House of Representatives on May 6, 1912, and on May 10, 1912, was transmitted to the Justices of the Supreme Judicial Court. On May 28, 1912, the Justices returned the answer which is subjoined.

Ordered, That the opinion of the Justices of the Supreme Judicial Court be required on the following important questions of law:

First. Are the provisions of the bill to extend and define the duties of the Homestead Commission, now pending in the House of Representatives, copies of which are submitted herewith, constitutional, and particularly are the provisions of section one of said bill constitutional ?

Second. Would the provisions of said bill, and particularly the provisions of section one of said bill, be constitutional if the following amendment of section one, now pending in the House of Representatives, were adopted: Strike out, in lines five and six, the words "providing homes for mechanics, laborers or other wage-earners," and insert in place thereof the words "for the purpose of improving the public health by providing homes in the more thinly populated areas of the State for those who might otherwise live in the most congested areas of the State" ?

To the Honorable the House of Representatives of the Common-
wealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court have considered the questions submitted to them, a copy of which is hereto annexed, and answer as follows:

The questions relate to the constitutionality of a bill entitled "An Act to extend and define the duties of the homestead commission." The general scheme embodied in the proposed bill is that the Commonwealth shall purchase land, and develop, build upon, rent, manage, sell and repurchase the same. The Homestead Commission is clothed with the fullest power to go into the business of buying, renting and selling real estate. As expressed in the bill, its purpose is to provide homes "for mechanics, laborers, or other wage-earners," or as suggested by the amendment set forth in the second question, to improve "the public health by providing homes in the more thinly populated areas of the State for those who might otherwise live in the most congested areas of the State." In a constitutional sense the difference between these two statements of purpose is not material in view of the actual provisions of the bill. The substance of it is that the Commonwealth is to go into the business of furnishing homes for people who have money enough to pay rent and ultimately to become purchasers. It is not a plan for pauper relief.

The question is whether this is a public use.

To this fundamental test must be brought all governmental activity in every system based upon reason rather than force. The dominating design of a statute requiring the use of public funds must be the promotion of public interests and not the furtherance of the advantage of individuals. However beneficial in a general or popular sense it may be that private interests should prosper and thus incidentally serve the public, the expenditure of public money to this end is not justified. Government aid to manufacturing enterprises, the development of water powers and other natural resources by private persons or corporations with public funds, either through loans or by the more indirect method of exemption from taxation or taking of stock, have been universally condemned by courts throughout the country, although often attempted by legislation. The leading case is *Lowell* v. *Boston,* 111 Mass. 454, where a statute was considered authorizing the city of Boston to issue bonds for the raising of money to be lent to owners of real estate whose buildings had been destroyed in the devastation wrought by the Boston fire of 1872. This statement of the law by Mr. Justice Wells, at 461, hardly can be surpassed for accuracy and clear-

ness: "The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion." This principle has been applied to a great variety of cases. It was amplified with a full citation' of authorities in *Opinion of the Justices,* 204 Mass. 607.

The question, in its last analysis is one of taxation. Can the Commonwealth raise money by taxation for the purposes set forth in the act ?

Taxation is the ultimate question notwithstanding the provisions of § 3, which authorize the treasurer and receiver-general to lend to the commission, from funds deposited in the treasury of the Commonwealth by the savings banks under St. 1908, c. 590, § 56. This statute requires payment to the treasurer of the Commonwealth of all deposits in savings banks whose owners are unknown, which have remained untouched for thirty years. The constitutionality of this statute was upheld in *Attorney General* v. *Provident Institution for Savings,* 201 Mass. 23; *S. C.* 221 U. S. 660, on the express ground that the money is to be held and used by the Commonwealth "in recognition of the rights of the owner, and of the necessity of repaying it to him, with interest, when he establishes his lawful right thereto. The Commonwealth, under the statute, becomes a kind of trustee for the owner." These funds belong to a large number of persons. It may be that some never will be reclaimed, while undoubtedly some of them will be demanded. This bill does not contemplate a mere investment of funds in such form that they may be available for payment

to the real owner when he appears. On the contrary its manifest purpose is a permanent investment not subject to repayment in any form for at least six years, and thereafter only by instalments. It does not appear how large the savings bank deposit is, nor is that material. The Commonwealth holds the entire fund as trustee and must be ready to pay it to the owners on demand. So far as the Commonwealth by a permanent investment renders itself unable to make such repayment on demand, it must be ready to repay out of other funds. But these can be raised only by taxation. In any event, therefore, the question is one of taxation. It is too obvious for discussion that the proposed loan is not an investment on any theory of trusteeship, which courts are bound to administer. *Dickinson, appellant,* 152 Mass. 184. *Brigham* v. *Morgan,* 185 Mass. 27. While these rules may not bind the Legislature in dealing with trust funds held by the State, a wide divergence from them stamps the character of the act as an appropriation and not as an investment. Nor can it be said that this is an investment on the ground that such funds may not be claimed. This would be contrary to the principle on which the constitutionality of the statute was upheld and under which the Commonwealth obtained possession of the money. It would be treating the money in substance as escheated. Even if it were escheated it then would be money in the treasury freed from any trust. Such money, however, is public money and can be appropriated only to public uses. It can no more be diverted for private benefit than can money raised by taxation. *Simmons* v. *Hanover,* 23 Pick. 188. *Allen* v. *Marion,* 11 Allen, 108.

Taxation is somewhat historical in its nature and can be most intelligently approached by comparison of those subjects which have been held to be a public use and those which have been held not to be a public use. It is not now open to question that the establishment and maintenance of water and sewerage systems and electric light and gas plants are public uses. They relate to commodities which are or have become universally necessary, and they cannot be procured by each individual or family acting separately, but require co-operation. As a practical matter provision for these necessities is monopolistic in character, and having due regard to the reasonable convenience of the public, there can be no competition respecting them. The permanently exclusive

use of portions of the public ways is essential to the effective furnishing of these necessities. Highways are public in their nature, and their construction and repair are legitimate public expenses. Hence they cannot be appropriated to any use which is private. These necessities cannot be provided without the exercise of powers conferred only by the Legislature, and commonly require the exercise of eminent domain. Although water and artificial light are in a certain sense beneficial to individuals, their public functions are so overshadowing as to mark them as proper subjects for State or municipal ownership. *Opinion of the Justices,* 150 Mass. 592.

On the other hand it was said in *Opinion of the Justices,* in 1892, 155 Mass. 598, and again in 1903, 182 Mass. 605, that it was beyond the power of the Legislature to authorize cities and towns to engage in the business of furnishing coal or fuel to the public. The economic aspects of conducting business of this character through public instrumentalities are not for our consideration. Such a system is not possible under our Constitution. The grounds upon which these opinions were founded are that such enterprises are conducted by individuals. They are universally recognized as legitimate and proper fields for private and personal adventure. No legislative authority is required to engage in them, and no powers derived from that source are needed for their prosecution. It is a natural right subject only to regulation by the police power. A person lawfully engaged in such business cannot be driven out by taxation to support his rival even though that rival be an arm of government.

The questions of the present order are closely analogous to those raised by the order of the Honorable House considered in *Opinion of the Justices,* 204 Mass. 607. It was said there in substance that it was not within the power of the Legislature to authorize the taking of land outside the limits of streets for the purpose of being leased or sold under such restrictions as would insure proper development of industrial and commercial facilities. Such purpose was said to be primarily for the aggrandizement of individuals and only incidentally for the promotion of the public weal. We are unable to distinguish the purchase, development, renting and sale of land in the manner provided by the present bill from the principles announced in these decisions and opinions and

many others collected and somewhat reviewed in 204 Mass. 607.

Buying and selling land always has been freely exercised by all individuals who desired, under the Constitution. Proprietorship of his own home has been one of the chief elements of strength in the citizen, and widely diffused land ownership has conferred stability upon the State. It is matter of common knowledge that thousands of inhabitants of the Commonwealth who are "mechanics, laborers or other wage-earners" have become, through industry, temperance and frugality, owners of the homes in which they dwell. These proprietors, however humble may be their houses, cannot be taxed for the purpose of enabling the State to aid in acquiring a home others whose temperament, environment or habits have heretofore prevented them from attaining a like position. Although eminent domain differs from taxation in the occasion and manner of its exercise, it rests for its justification upon the same basic principle of public necessity. If this be held to be a public purpose, it would be lawful to authorize the commission to exercise the power of eminent domain. This would mean that the home of one wage-earner might be taken by the power of the Commonwealth for the purpose of handing it over to another wage-earner. Neither the power of taxation nor of eminent domain goes to this extent. If the purpose is a public one, the property of every inhabitant, however improved or used, must yield to the superior right. But if the end to be gained is not public, no one can be compelled to contribute under either form of governmental power.

Ownership of a bit of land is one of the deep seated desires of mankind. The property resting on such proprietorship is among the dearest rights in the minds of many people secured by the Constitution. If the power exists in the Legislature to take a tract of land away from one owner for the purpose of enabling another to get the same tract, the whole subject of such ownership becomes a matter of legislative determination and not of constitutional right.

Experiments in other lands, where the people have established either no bounds or fragile ones to the absolutism of governmental powers by a written constitution, afford no guide in the determination of what our Constitution permits.

It may be urged that the measure is aimed at mitigating the evils of overcrowded tenements and unhealthy slums. These evils are a proper subject for the exercise of the police power. Through the enactment of building ordinances, regulations and inspection as to housing and provision for light and air lies a broad field for the suppression of mischiefs of this kind.

For these reasons the Justices of the Supreme Judicial Court (with the exception of Mr. Justice Loring, whom there has been no opportunity to consult) respectfully answer both questions in the negative.

> ARTHUR P. RUGG.
> JAMES M. MORTON.
> JOHN W. HAMMOND.
> HENRY K. BRALEY.
> HENRY N. SHELDON.
> CHARLES A. DECOURCY.