MASSACHUSETTS HOME MORTGAGE FINANCE AGENCY *vs.* NEW ENGLAND MERCHANTS NATIONAL BANK OF BOSTON.

Suffolk. May 3, 1978. — November 17, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Massachusetts Home Mortgage Finance Agency. Housing. Constitutional Law,* Public Purpose, Housing, Delegation of powers, Expenditure of public money. *Practice, Civil,* Declaratory relief.

Discussion of circumstances in which public housing may serve a "public purpose" within the meaning of Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution. [676-684]
Summary of the provisions of St. 1974, c. 846, as amended by St. 1977, c. 561, the Massachusetts Home Mortgage Finance Agency statute. [684-689]
The provisions of St. 1974, c. 846, as amended by St. 1977, c. 561, creating the Massachusetts Home Mortgage Finance Agency to promote expansion of the supply of funds at low interest rates available for new residential mortgages for persons of low income and those of moderate income and thereby to help alleviate the shortage of adequate housing for such persons serve a "public purpose" within the meaning of Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution. [689-696]

The question whether the provision of mortgage loans in accordance with St. 1974, c. 846, as amended by St. 1977, c. 561, to persons of low and moderate income constitutes a reasonable means of providing housing relief for such persons was for decision by the Legislature and is not subject to judicial review. [696-697]

The authority delegated by the Legislature to the Massachusetts Home Mortgage Finance Agency under St. 1974, c. 846, as amended by St. 1977, c. 561, is not unconstitutionally broad. [698]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 8, 1978.

The case was reported by *Braucher,* J.

*Arnold P. Messing* (*Margaret H. Marshall* with him) for the plaintiff.

*Robert H. Hale* (*George H. Butcher* with him) for the defendant.

*Jeffrey C. Bates,* for the Savings Banks Association of Massachusetts, amicus curiae, submitted a brief.

*Mark A. Michelson,* for the Citizens Housing and Planning Association, Inc., amicus curiae, submitted a brief.

*William A. Breitbart,* for the Housing Allowance Project, Inc., amicus curiae, submitted a brief.

*John J. Melican,* for the Department of Public Health, amicus curiae, submitted a brief.

*David A. White,* for the Jamaica Plain Banking and Mortgage Committee, Inc., amicus curiae, submitted a brief.

*Harold Hestnes & Richard A. Johnston,* for the Massachusetts Mortgage Bankers Association, amicus curiae, submitted a brief.

QUIRICO, J. This is an action brought under G. L. c. 231A by the Massachusetts Home Mortgage Finance Agency (MHMFA) against the New England Merchants National Bank (bank) for the determination of an alleged controversy between the parties and a declaration of their rights under an agreement by which the MHMFA agreed to sell, and the bank to purchase, certain bond anticipation notes in the principal sum of $1,250,000 to be issued by the MHMFA. The principal issue before us is

the constitutionality of the special statute which created the MHMFA. We conclude that the statute is constitutional and that the bank is obligated to purchase the notes in accordance with its agreement.

The case is before us on what is in effect a case stated. All the facts alleged by the MHMFA in its complaint have been admitted by the bank in its answer. The parties stipulated in writing "that the right[s] of the parties hereto shall be determined from the facts alleged in [the complaint] and the Exhibits appended thereto and admitted in the Defendant's Answer; that said facts and such further facts of which the Court may take judicial notice are all the material, ultimate facts from which the rights of the parties are to be determined, and that this Court . . . shall be at liberty to draw from the said facts any inferences of fact that might be drawn therefrom as if said pleadings constituted a case stated." The parties then filed a motion asking that the case be reserved and reported to the full court on the complaint and the exhibits appended thereto, the answer, and the stipulation. The motion was allowed by a single justice of this court.

The following is a brief summary of the facts alleged by the MHMFA and admitted by the bank. The MHMFA is a body politic and corporate established by St. 1974, c. 846, as amended by St. 1977, c. 561 (MHMFA statute), and the bank is a national banking association with its principal place of business in Boston. The MHMFA was created to promote the expansion of the supply of funds at low interest rates available for new residential mortgages for persons and families of low income and those of moderate income and thereby to help alleviate the shortage of adequate housing for such persons and families.

Sections 4 (*a*) and 5 of the MHMFA statute authorize the MHMFA to make loans to mortgage lenders under terms and conditions requiring the proceeds thereof to be used by the lenders for the making of new residential mortgage loans to low and moderate income persons and families (referred to as "Loans to Lenders Program").

Section 4 (u) authorizes the MHMFA to act as agent or principal for the purchase or sale of mortgage loans by lenders at such times as the availability of mortgage funds for homeowners in any area of the Commonwealth becomes constricted (referred to as the "Loan Participation Program"). Sections 4 (t) and 5 provide that cities and towns may propose, and the MHMFA may approve and designate, certain areas as "Neighborhood Preservation Areas," thus ensuring a concentration of funds available to homeowners and purchasers in such areas.

Section 4 (p) authorizes the MHMFA to "[m]ake and publish rules and regulations respecting the grant of loans under this act and the regulation of borrowers and any other regulations necessary to fulfill the purposes of this act." Pursuant thereto the MHMFA has promulgated certain rules and regulations to implement the Loans to Lenders Programs, the Loan Participation Programs and the Neighborhood Preservation Area Programs. The rules and regulations govern procedures for the submission of requests for participation in the programs, limitations and restrictions as to the characteristics of residences and individuals qualifying for mortgages and home improvement loans financed by MHMFA, and requirements and procedures for the administration and servicing of mortgages and home improvement loans financed by the MHMFA.

The MHMFA has entered into binding commitments with five banks to do the following:

(a) to loan $250,000 to the First American Bank for Savings, in Dorchester, under the Loans to Lenders Program, the proceeds to be used by said bank for making new residential mortgage loans to persons or families of low or moderate income;

(b) to loan $250,000 to the Freedom Federal Savings and Loan Association, in Worcester, under the Loans to Lenders Program in a Neighborhood Preservation Area, the proceeds to be used by said bank for the making of new residential mortgage loans in the Main South

376 Mass. 669            673

Massachusetts Home Mortgage Finance Agency *v.* New Eng. Merchants Nat'l Bank.

Columbus Park Neighborhood Preservation Area in Worcester;

(c) to fund, under the Loan Participation Program, the MHMFA's participation, in the sum of $250,000, in new residential mortgage loans to be made by the Jamaica Plain Co-operative Bank to persons and families of low or moderate income;

(d) to fund, under the Loan Participation Program, the MHMFA's participation, in the sum of $250,000, in new residential mortgage loans to be made by the Worcester County Institution for Savings, in Worcester, in the Main South Columbus Park Neighborhood Preservation Area in that city;

(e) to fund, under the Loan Participation Program, the MHMFA's participation, in the sum of $250,000, in new residential mortgage loans to be made by the Shawmut County Bank, in Cambridge, in the Cogswell Avenue Neighborhood Preservation Area in that city.

In order to raise the funds required for the five commitments described above, the parties entered into a written agreement on February 27, 1978, requiring the MHMFA to issue and sell, and the bank to purchase, bond anticipation notes of the MHMFA in the sum of $1,250,000. The agreement contained a provision which made the bank's acceptance of delivery of the notes conditional on the notes, when issued, being "valid obligations of the Agency [MHMFA], enforceable in accordance with their terms and the terms of the Resolution [dated February 27, 1978, authorizing issuance of the notes], and duly authorized by the Act [St. 1974, c. 846, § 8, as amended] and the Constitution of the Commonwealth of Massachusetts." There were other conditions which are not now material to this case.

On March 1, 1978, the bank received an opinion from its counsel doubting the constitutionality of the special act and the validity of the notes of the MHMFA on the ground, among others, that the proceeds obtained from the notes would not be devoted exclusively to valid public

purposes. On March 3, 1978, the MHMFA received a letter from the bank declining to accept delivery of the notes because of the opinion of the bank's counsel.

The concluding allegations made by the MHMFA and admitted by the bank are the following. An actual controversy exists between the parties. The MHMFA contends that the bank is bound by its agreement to purchase the notes, and that the issuance of the notes is constitutionally permissible. The bank contends that it is not bound to purchase the notes on the ground that the MHMFA statute is unconstitutional. A judgment by the court will terminate the uncertainty and controversy, permit MHMFA to proceed to implement its programs, and permit the bank to determine whether it is bound by its agreement to purchase the notes.

In the letter sent to the MHMFA on March 3, 1978, the bank stated: "We enclose a copy of a letter from [our counsel] dated March 2, 1978, in which they state that they are unable to give an opinion that certain of these conditions [in the contract of February 27, 1978, to purchase the MHMFA notes] are or can be met. Acting on their advice, we regret that we must hereby formally notify you that, if and when you should tender the Notes to us, we shall decline their purchase." The opinion by the bank's counsel raises two constitutional questions related solely to the condition contained in par. 4 (a) of the contract and reproduced in full in the margin below.[1] These questions are the following: (a) whether the purposes to be served by the MHMFA under the special statute are public purposes within the limitations of the Constitution

---

[1] "4. The obligations of the Agency to issue and sell the Notes and the obligations of the Purchaser to purchase the Notes are subject to the following conditions:

"(a) That the Notes, when issued, shall be valid obligations of the Agency, enforceable in accordance with their terms and the terms of the Resolution and duly authorized by the Act and the Constitution of the Commonwealth of Massachusetts."

. . . .

of this Commonwealth, and (b) whether the MHMFA statute contains an unconstitutionally broad delegation of legislative authority to the MHMFA. Notwithstanding its sole reliance on the opinion of its counsel raising those two constitutional questions when it repudiated its contract, the bank by its brief raises some statutory questions which it contends justify its refusal to purchase the notes. These statutory questions were not raised in the opinion of the bank's counsel, nor were they advanced by the bank in its letter of March 3, 1978, as a basis for its refusal to purchase the notes. We therefore limit this opinion to the two constitutional questions originally relied on by the bank.

Before considering the constitutional questions, we turn to the question raised by an amicus curiae whether there is an actual controversy before us. The brief of this amicus states: "This case, while ostensibly between an agency seeking to enforce a purchase and sale agreement and a bank seeking to invalidate the agreement because of the unconstitutionality of the act creating and empowering the agency, is in actuality a joint venture to establish the constitutionality of the statute. The speed and coordination with which this action was instituted evidences the parties' joint interest in having the act declared constitutional so that they may proceed with the purchase and sale of the notes."[2]

This comment is based on the following chronology appearing in the record. The agreement was signed by the parties on February 27, 1978. On March 1, 1978, the bank received the opinion of its counsel questioning the constitutionality of the MHMFA statute. On March 3, 1978, the bank informed the MHMFA that it would not perform the agreement. On March 8, 1978, the MHMFA filed the complaint in this case, the bank filed its answer admitting all the allegations in the complaint, and the parties

---

[2] This language is quoted from the brief filed in behalf of the Massachusetts Mortgage Bankers Association.

filed their stipulation that the rights of the parties be determined on the facts thus admitted. The parties signed a joint motion that the matter be reserved by the single justice and reported to the full court on March 10, 1978. That motion was allowed on March 15, 1978. Thus, within ten days after the agreement was signed the bank had declined to perform and the parties had completed their pleadings and submitted their "actual controversy" to the court.

The comment by the amicus is not unwarranted when considered on the combined basis of the carefully chosen contract condition and the timing and pattern of this litigation. One of the objectives of such a contract condition appears to be to set the stage on which the parties may seek a judicial decision on an anticipated legal or constitutional question before they assume any risk incident to performance of the contract. There is a striking similarity between the contract condition and litigation pattern in this case and those found in *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank*, 356 Mass. 202, 203, 205 (1969), *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. 538, 541 (1965), *Dodge* v. *Prudential Ins. Co.*, 343 Mass. 375, 376-377 (1961), and *Boston* v. *Merchants Nat'l Bank*, 338 Mass. 245, 246 (1958). If what we have before us is a contractually contrived and staged controversy, it is questionable whether it is an "actual controversy" of the type which is justiciable under the Declaratory Judgment Act, G. L. c. 231A, § 1.

While we proceed to judgment in this case, we do so without foreclosing inquiry into the nature of the controversy in similar proceedings in the future.

1. *General question whether public housing is a public purpose.* This question, although discussed in terms of what is or is not a public purpose, is rooted in the constitutional question of the scope and limits of the exercise of the legislative power of taxation. We start with the power given to the Legislature by the Massachusetts Constitu-

tion, Part II, c. 1, § 1, art. 4, to impose and levy taxes "to be issued and disposed of . . . for the public service, in the necessary defence and support of the government of the said commonwealth, and the protection and preservation of the subjects thereof, according to such acts as are or shall be in force within the same."

One of the early and frequently cited or quoted statements of the scope and limits of this legislative power is the following found in *Lowell* v. *Boston,* 111 Mass. 454, 460-461 (1873): "The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion."

We think it may be helpful to review briefly a number of decisions by this court and opinions of the Justices of this court showing the application and development of this fundamental constitutional principle since the *Lowell* decision.

In *Opinion of the Justices*, 211 Mass. 624 (1912), it was concluded that the use of public funds to provide homes for mechanics, laborers, or other wage earners by buying, renting, and selling real estate would not be a public use. *Id.* at 630. In *Salisbury Land & Improvement Co.* v. *Commonwealth*, 215 Mass. 371 (1913), a statute which authorized the purchase or taking by the Commonwealth of a large area of property along the ocean, including both developed and undeveloped parcels, and then authorizing the sale of substantial portions thereof which would not be incorporated in a proposed public park and beach, was unconstitutional. *Id.* at 380.[3] The conclusions reached in

---

[3] The 1912 *Opinion of the Justices*, 211 Mass. 624 (1912), and the *Salisbury Land & Improvement Co.* v. *Commonwealth*, 215 Mass. 371 (1913), decision are commonly believed to have furnished the impetus for the adoption of art. 43 of the Amendments to the Constitution of the Commonwealth. Robinson, Public Housing in Massachusetts, 18 B.U.L. Rev. 83, 89 (1938). 80 Harv. L. Rev. 1811, 1813 (1967). Article 43, adopted in 1915, provides: "The general court shall have power to authorize the commonwealth to take land and to hold, improve, subdivide, build upon and sell the same, for the purpose of relieving congestion of population and providing homes for citizens: *provided, however*, that this amendment shall not be deemed to authorize the sale of such land or buildings at less than the cost thereof." In *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank*, 356 Mass. 202, 211 (1969), we said: "We assume (without deciding) that some of the constitutional difficulties mentioned in *Opinion of the Justices*, 211 Mass. 624, 626, 629-630 [1912], may have been obviated by art. 43 of the Amendments to the Constitution of the Commonwealth."

There have been only a very few occasions on which this court or the Justices of this court have been called on to consider art. 43. In *Opinion of the Justices*, 291 Mass. 567, 570-571 (1935), the Justices said: "The power conferred upon the General Court by art. 43 of the Amendments to the Constitution to take land for the purpose of relieving congestion of population and providing homes for citizens does not authorize the Commonwealth to go into the business of lending money upon homes either directly or indirectly." Because the *Allydonn Realty Corp.* v. *Holyoke Hous. Auth.*, 304 Mass. 288 (1939), opinion was based on c. 1, § 1, art. 4, of Part II of the Constitution, we "found it [un]necessary to consider any possible bearing of arts. 43 and 47 of the Amendments." *Id.* at 297. Again in *Opinion of the Justices*, 321 Mass. 766 (1947), where the Justices concluded that a proposed statute for veterans' housing would be constitutional, the opinion was based on

376 Mass. 669                                              679

Massachusetts Home Mortgage Finance Agency *v.* New Eng. Merchants Nat'l Bank.

the 1912 *Opinion of the Justices and in the Salisbury Land & Improvement Co.* decision, both cited above in this paragraph, have been cited or followed in a number of subsequent Opinions of the Justices or in decisions by this court. In *Opinion of the Justices*, 332 Mass. 769, 781-782 (1955), involving a proposed statute relating to one of the early plans for the development of what ultimately became the Prudential Center, the Justices said: "[O]ne proposition is thoroughly established practically everywhere, and so far as we are aware without substantial dissent, and that is that public money cannot be used for the primary purpose of acquiring either by eminent domain or by purchase private lands to be turned over or sold to private persons for private use." To the same effect, see *Opinion of the Justices*, 330 Mass. 713, 724 (1953), involving the statute establishing the Massachusetts Turnpike Authority, *Opinion of the Justices*, 321 Mass. 766, 770 (1947), and *Wright* v. *Walcott*, 238 Mass. 432, 434-435 (1921).

In *Opinion of the Justices*, 291 Mass. 567 (1935), it was concluded that the establishment of a public corporation which would act as a governmental agency to engage in the business of lending money on mortgages of real estate, using therefor money obtained directly or indirectly through the exercise of the Commonwealth's power of taxation would not be a public purpose. *Id.* at 570-571.

---

Part II, c. 1, § 1, art. 4, of the Constitution and concluded: "Since the power of the General Court to authorize the taking of land for the purposes of the pending bill is not derived from art. 43 of the Amendments to the Constitution, the exercise of such power is not limited by the provision of said art. 43 'that this amendment shall not be deemed to authorize the sale of such land or buildings at less than the cost thereof.' " *Id.* at 770-771.

Similarly, in the present case our opinion is based on Part II, c. 1, § 1, art. 4, of the Constitution, and we therefore need not consider or speculate whether the basic objective of art. 43 of the Amendments was to relieve congestion of population and provide homes for citizens, rather than narrowly to achieve that objective solely by granting power to the Commonwealth "to take land and to hold, improve, subdivide, build upon and sell the same." See 3 Debates in the Massachusetts Constitutional Convention, 1917-1918, at 403 (1918).

The first significant change in the application of the constitutional principle stated in the *Lowell* case came in the decision of *Allydonn Realty Corp.* v. *Holyoke Hous. Auth.*, 304 Mass. 288 (1939), in which this court held constitutional the housing authority law, G. L. c. 121, §§ 26I-26II, inclusive, inserted by St. 1938, c. 484, § 1. (See now G. L. c. 121B, inserted by St. 1969, c. 751, § 1, relating to housing and urban renewal and related subjects.) That was the first comprehensive statute authorizing the use of public funds for the construction of low rent housing for families of low income, coupled with the elimination of unsafe or unsanitary housing units in a number substantially equal to the number of new units built under the program. 304 Mass. at 291-292. This court upheld the statute as constitutional as to both functions, viz., slum clearance,[4] and provision of low rent housing for families of low income. *Id.* at 294-296.

As to the slum clearance function, the court said at 293-294: "The statute contains legislative findings in substance that slums exist in this Commonwealth, and that they tend to increase crime and to menace the health and comfort of the inhabitants. These findings are entitled to weight in this court. . . . We cannot say that expenditures directed in a rational manner toward the elimination of slums are not expenditures for public purpose. It is unnecessary to dilate at length upon the pernicious influence of slums, upon the manner in which that influence may be found to reach out and to affect an entire community, lowering moral standards, and increasing the cost to all of police, fire and health protection. The analogy between a slum and a public nuisance cannot be overlooked. Although the injurious effects of the former are less obvious and more insidious than those of the latter,

---

[4] We use the word "slum" for the sole reason that this word was used in *Allydonn Realty Corp.* v. *Holyoke Hous. Auth.*, 304 Mass. 288, 295 (1939). We use it in lieu of the words "blighted open area," "decadent area," and "substandard area" as such words are defined in G. L. c. 121B, § 1, and used in that chapter.

they are likely to penetrate more deeply and to spread more widely. The abatement of a public nuisance may well be a public purpose. . . . The elimination of slums can be found to be a direct benefit and advantage to all of the people, to be a matter not readily approached through private initiative but demanding coordinated effort by a single authority, to be in line with the purposes of promoting the public safety, health and welfare for which the government of the Commonwealth was established, and to require for its successful accomplishment the exercise of the power of eminent domain. It may well be deemed to rise to the dignity of a public service."

As to the statute's function in providing low rent housing for families of low income, the court in *Allydonn* acknowledged the obstacles presented by *Opinion of the Justices*, 211 Mass. 624 (1912), and by the *Salisbury Land* case, *supra*, and noted that those cases dealt neither with slum clearance nor with public safety, health, morals, or welfare, and that therefore they were inapplicable. 304 Mass. at 296. The court then said: "The real purpose of the statute is therefore the elimination of slums and unsafe and unsanitary dwellings, and the provision by public funds of low-rent housing is only a means by which the main object is to be accomplished. The statute as a whole is designed to serve a public need, and the money expended for low-rent housing, as well as that expended for slum clearance, is for a public use. Whether the scheme adopted by the Legislature will work out as intended, and whether the safeguards are sufficient to insure successful operation are not, of course, judicial questions. We cannot say that the plan is not adapted in a rational manner to bring about a result within the scope of legislative competence." *Id.* at 295-296. *Stockus* v. *Boston Housing Auth.*, 304 Mass. 507, 508 (1939).

This court seemed to place considerable reliance on the dual functions of slum clearance and the provision of low rent housing to low income families when upholding the constitutionality of the housing authority law in the *Al-*

*lydonn* decision. On several occasions since then, however, the Justices of this court have expressed the opinion that proposed statutes which authorized the expenditure of public funds for housing but which did not serve those two functions would nevertheless be constitutional. One such occasion was in *Opinion of the Justices*, 331 Mass. 771 (1954), involving a proposed bill relating to "housing for elderly persons of low income." At 775, the Justices said: "[I]t becomes necessary to consider whether the provisions of the proposed bill for the benefit of elderly persons of low income are constitutional and valid apart from any elimination of slums or of unsafe and unsanitary dwellings. We are of opinion that they are." Other occasions involved proposed bills for housing for World War II veterans without regard to whether they were persons of low income or whether the accomplishment of the objective involved any slum clearance. See *Opinion of the Justices*, 320 Mass. 773, 781 (1946); *Opinion of the Justices*, 321 Mass. 766, 770 (1947). Yet another occasion involved a bill for housing for veterans of low income, with first priority to World War II veterans, then to other veterans, notwithstanding that the bill provided that G. L. c. 121, § 26GG, as appearing in St. 1946, c. 574, § 1 (see now G. L. c. 121B, § 33), requiring the elimination of unsafe or unsanitary dwelling units substantially equal in number to the number of newly constructed dwelling units would not be applicable. *Opinion of the Justices*, 322 Mass. 745, 748 (1948).

Another significant development since the *Allydonn* decision has been in the concept of urban renewal, which was formerly the responsibility of housing authorities in many municipalities but is now more commonly the responsibility of redevelopment authorities. See G. L. c. 121B, §§ 1, 4, 9, 48-59, and their predecessor statutes. There is now a considerable body of judicial decisions and opinions in this Commonwealth recognizing the constitutionality of using the taxing power to acquire, by eminent domain, purchase, gift, or otherwise, decadent, substand-

ard, or blighted open areas, and then to dispose of the whole or any part thereof to purchasers who will be obligated to develop and use the property in accordance with an established urban renewal plan. The ultimate use need not necessarily be limited to residential purposes. The following decisions and opinions demonstrate the evolution of the once narrow "public purpose" concept expounded in *Lowell,* and extended by *Allydonn,* to the point that a broad variety of urban renewal projects, having little or nothing to do with the provision of low cost housing to persons or families of low income and not limited to periods of extreme emergencies and shortages in available housing, are now thought constitutional. *Dodge* v. *Prudential Ins. Co.,* 343 Mass. 375, 382-384 (1961). *Opinion of the Justices,* 334 Mass. 760, 763 (1956). *Opinion of the Justices,* 331 Mass. 771, 777 (1954). *Papadinis* v. *Somerville,* 331 Mass. 627, 632 (1954). But see *Opinion of the Justices,* 332 Mass. 769, 781-784 (1955).

Other illustrations of the ever broadening constitutional limits of the words "public purpose" may be found in the following opinions: *Opinion of the Justices,* 359 Mass. 769, 772 (1971), involving the proposed making of loans by the Commonwealth to private industrial and business establishments for use for water pollution waste treatment facilities, *Opinion of the Justices,* 368 Mass. 880, 885-886 (1975), involving a proposed State agency to provide insurance on loans made to finance industrial development facilities, and *Opinion of the Justices,* 373 Mass. 904, 907 (1977), involving the proposed public financing of community development projects.

From the opinions and decisions that we have reviewed above, we conclude that promoting these categories of public housing serves a "public purpose" in the constitutional sense: (a) housing for low income persons or families when the construction is related to or accompanied by slum clearance or an urban renewal project, and (b) housing for veterans or for low income or elderly persons or families without the necessity of any related or

concurrent slum clearance or urban renewal. Arguably, the words "public purpose" may also include providing public housing for low income persons and families, without limitation to veterans or elderly and without the necessity of any related or concurrent urban renewal.

2. *Summary of MHMFA statute.* We summarize the MHMFA statute to the extent necessary for the decision of the ultimate question whether its purposes are public purposes.

Section 1 sets forth a number of definitions, the pertinent ones of which, those for "low income persons or families," "moderate income persons or families," "annual income," and "MHMFA," are reproduced in the margin below.[5]

Section 2 is a declaration of the public necessity for the legislation and it is reproduced in full in the margin below.[6] The significant findings and declarations are the

---

[5] " 'Low income persons or families', those persons and families whose annual income is equal to or less than the maximum amount which would make them eligible for units owned or leased by the housing authority in the city or town in which the residence for which the mortgage loan is sought is located or, in the event that there is no housing authority, that amount which is established as the maximum for eligibility for low-rent units by the department of community affairs.

" 'Moderate income persons or families', those persons and families whose annual income is less than the amount necessary to enable them to obtain and maintain decent, safe and sanitary housing without the expenditure of over twenty-five per cent of such income for housing expenses, including the provision of heat, electricity, hot water and an allowance for maintenance and repairs.

" 'Annual income', a family's or person's gross annual income less such reasonable allowances for dependents, other than spouse, and for medical expenses as MHMFA determines.

" 'MHMFA', the Massachusetts Home Mortgage Finance Agency."

[6] "It is hereby found that as a result of the continuing increases in the cost of construction or rehabilitation, municipal taxes, heating and electricity expenses, maintenance and repair expenses and the cost of land, low income persons and families and moderate income persons and families in many areas within the commonwealth, including areas which contained formerly stable neighborhoods, are unable to purchase, rehabilitate and maintain decent, safe and sanitary hous-

following. Due to increasing housing costs, low income persons and families and moderate income persons and families are unable to purchase, rehabilitate, and maintain decent, safe, and sanitary housing. This causes the decline of new housing construction, the decay of existing housing and neighborhoods, and the increase of public

---

ing which provide an opportunity for home ownership either directly or through a condominium or cooperative form of ownership. The inability of such families to purchase and hold housing in the commonwealth results in the decline of new housing and in the decay of the existing housing stock and of existing neighborhoods with attendant increases in municipal costs for welfare, police and fire protection. The decline in new housing, together with the decay of existing housing stock, has produced a critical shortage of adequate housing in the commonwealth adversely affecting the economy of the commonwealth and the well-being of its residents. Private enterprise without the assistance contemplated by this act cannot achieve the construction or rehabilitation of any housing for persons and families of low or moderate income and the alternative of forcing such families to live in substandard housing is undesirable since it tends to decrease the interest of such families in their communities, the maintenance of their property and the preservation of their neighborhoods.

"A large and significant number of commonwealth residents have and will be subject to hardship in finding decent, safe and sanitary housing unless new facilities are constructed and existing housing, where appropriate, is rehabilitated. Unless the supply of housing and the ability of low income persons and families and moderate income persons and families to obtain mortgage financing is increased significantly and expeditiously, a large number of residents of the commonwealth will be compelled to live in unsanitary, overcrowded and unsafe conditions to the detriment of the health, welfare and well-being of these persons and of the whole community of which they are a part. By increasing the housing supply of the commonwealth and the ability of low income persons and families and moderate income persons and families to obtain mortgage financing, the clearance, replanning, development and redevelopment of blighted areas will be aided, and the critical shortage of adequate housing will be ameliorated.

"It is hereby found that a major cause of this housing crisis is the lack of funds at interest rates which are at a level whereby low and moderate income persons and families can afford to own and maintain decent, safe and sanitary housing, and further, it is hereby found that an additional major cause of such a housing crisis is the lack of funds available to finance housing by the private mortgage lending institutions of the commonwealth. It is further found that this lack of funds has frustrated the maintenance, sale and purchase of existing residences in the Commonwealth.

costs for welfare, police, and fire protection. The resulting critical shortage of adequate housing adversely affects the economy of the Commonwealth and the well-being of its residents. Without the assistance contemplated by this statute, private enterprise cannot construct or rehabilitate housing for persons and families of low or moderate income. The alternative of forcing such persons to live in substandard housing is undesirable because it tends to decrease their interest in their communities, the maintenance of their property, and the preservation of their neighborhoods. Unless the supply of housing and the ability of persons and families of low and moderate income to obtain mortgage financing is increased, many persons will be compelled to live in unsanitary, over-crowded, and unsafe conditions to the detriment of the health, welfare, and well-being of the whole community. Two major causes of the housing crisis are (a) the lack of funds at interest rates low enough to enable persons and families of low and moderate income to own and maintain decent, safe, and sanitary housing, and (b) the lack of funds available to finance housing by private mortgage

---

"It is hereby further found that to aid in remedying these conditions, to promote the expansion of the supply of funds at low interest rates available for new residential mortgages for low income persons and families and moderate income persons and families and thereby help alleviate the shortage of adequate housing, a corporate agency of the commonwealth shall be created with power (*i*) to raise funds from private investors in order to make those funds available, through mortgage lending institutions, for new residential mortgage loans to low income persons and families and moderate income persons and families, (*ii*) to insure such new residential mortgage loans, and (*iii*) to provide technical assistance to low income persons and families and moderate income persons and families desiring such new residential mortgage loans. By utilizing such powers the agency created shall help develop the financial resources available to meet such housing needs.

"It is hereby further found that the authority and powers conferred under this act and the expenditure of public moneys pursuant thereto constitutes a serving of a valid public purpose and that the enactment of the provisions hereinafter set forth is in the public interest and is hereby so declared to be such as a matter of determination by the general court." St. 1974, c. 846, § 2, as amended by St. 1977, c. 561, § 1.

376 Mass. 669                                    687

Massachusetts Home Mortgage Finance Agency *v.* New Eng. Merchants Nat'l Bank.

lending institutions of the Commonwealth. To aid in remedying these conditions, the MHMFA is created as an agency of the Commonwealth with power (a) to raise funds from private investors and to make them available, through mortgage lending institutions, to low income persons and families and moderate income persons and families for new residential mortgage loans, (b) to insure such loans, and (c) to assist such persons and families of low or moderate income in obtaining new residential mortgage loans. There is then a concluding declaration that the powers conferred on the MHMFA and the expenditure of public moneys pursuant thereto "constitutes a serving of a valid public purpose" as determined by the Legislature.

Section 3 creates the MHMFA as a public instrumentality and declares that its exercise of the powers conferred on it "shall be deemed and held to be the performance of an essential governmental function."

Sections 4 and 5 set forth both the general and the specific powers and authority vested in the MHMFA for the accomplishment of its intended purposes. It may loan money to mortgage lenders (banks and certain other financial institutions), which will in turn use the money for residential mortgage loans to persons or families of low or moderate income. The ultimate use of the money by the borrowing mortgagor will be for the purchase or rehabilitation of a dwelling he will occupy. Section 5 requires 80% of bond proceeds to be used for "new residential mortgages" in ten year old or older buildings. The MHMFA may limit the use of such funds by a mortgage lender to a designated "neighborhood preservation" area. This means an area requiring special attention to prevent or stem prevalent deterioration and blight in its housing stock but where the financing for the needed repairs and rehabilitation is not available from conventional sources. The MHMFA is also authorized to contribute to the availability of residential mortgage financing by purchasing participation shares in mortgages made by mortgage

lenders to persons or families of low or moderate income, thus increasing the funds available to the lenders for such loans. Loans made by the MHMFA to mortgage lenders must be at interest rates which are at least sufficient to assure the MHMFA's payment of the interest due by it on the bonds which it issued to obtain the money loaned to the mortgage lenders. The MHMFA may also restrict the rate of interest charged by the mortgage lenders on the residential mortgage loans resulting from the MHMFA loan to the lender.

Sections 6, 7, and 7A relate to a mortgage insurance program, technical assistance to potential borrowers from mortgage lenders, and a resident ownership subsidy program, none of which is directly involved in the question before us.

Section 8 authorizes the MHMFA to issue bonds and notes to provide sufficient funds for achieving its corporate purposes, and to sell them at public or private sale. The bonds or notes may be secured by the full faith and credit of the MHMFA or by a pledge of its revenues, receipts, or loan collateral. The aggregate of the bonds and notes outstanding at any one time shall not exceed $25,000,000.

Section 9 provides that the bonds and notes of the MHMFA shall not constitute a debt of the Commonwealth and shall be payable solely from the proceeds of loans made by the MHMFA or any reserve funds created therefor by the MHMFA.

Section 10 requires the MHMFA to establish a capital reserve fund to be funded from several sources, one of which consists of funds which may be appropriated therefor after inclusion in the annual budget of the Commonwealth.[7]

---

[7] The portion of § 10 relating to the appropriation of public funds for the capital reserve fund is the following: "In order further to assure such maintenance [of the solvency] of the Capital Reserve Fund there shall be annually appropriated and paid to the MHMFA for deposit in the ... [fund] such sum, if any, as shall be certified by the chairman

376 Mass. 669                                                  689

Massachusetts Home Mortgage Finance Agency *v.* New Eng. Merchants Nat'l Bank.

Section 11 permits the MHMFA to enter into a trust agreement to secure the bonds and notes which it issues, if it so desires.

Section 12 provides that since "[t]he creation of the MHMFA is in all respects for the benefit of the people of the commonwealth and for the improvement of their health, safety, welfare, comfort and security, and its purposes are public purposes and the MHMFA shall be performing an essential governmental function . . . the notes and bonds of the MHMFA, issued pursuant to this act and the income therefrom shall at all times be free from taxation."

The remaining sections (13-18) are of no relevance to the issues before us, except that § 17 provides: "This act, being necessary for the welfare of the commonwealth and its inhabitants, shall be liberally construed to effect the purposes thereof."

3. *Are purposes to be served by MHMFA public purposes?* Admittedly the purposes intended to be served by the MHMFA exceed those served by the statutes and proposed statutes considered in the decisions and opinions reviewed in part 1 of this opinion. Both parties have briefed and argued this case by first reviewing many of these decisions and opinions and commenting on the limitations imposed by the court on the types of public housing which meet the test of a public purpose, and by then concentrating on the question whether the purposes to be served by the MHMFA, in so far as they exceed those heretofore approved as constitutional, are public purposes. We take the same approach, and consider the basic question to be whether the provision of public housing for persons and families of moderate income, in the circumstances underlying and in the manner contemplated by

of the MHMFA to the governor as necessary to restore the . . . [fund] to an amount equal to the maximum amount of principal and interest, whether at maturity or by annual sinking fund payment, maturing or becoming due in any succeeding calendar year on the bonds of the MHMFA then outstanding."

the MHMFA statute, is a public purpose. We hold that it is.

This question was first considered in *Opinion of the Justices,* 351 Mass. 716 (1966). There the Justices had before them questions on the constitutionality of a bill (1966 House Bill No. 3696) which, if enacted, would create the Massachusetts Housing Finance Agency (MHFA) with powers and purposes in some respects similar to those now contained in the MHMFA statute. The bill included a "Declaration of Public Necessity" stating, inter alia, that "there exists in many cities and towns in the commonwealth a serious shortage of decent, safe, and sanitary housing available at low rentals to persons of low income . . . ." *Id.* at 717. The opinion of a majority of the Justices, concluding that the proposed legislation would be unconstitutional, reads in part as follows: "The first question is whether the granting by the Agency [the MHMFA] of low interest loans for financing the building or rehabilitation of housing planned to be available at low and moderate rentals for low and moderate income families would constitute a public purpose for which money could be raised by taxation as provided in § 8A (c) [1966 House Bill No. 3696]. This section authorizes an annual payment out of the General Fund of the Commonwealth and 'subject to appropriation' by the General Court of the sum certified by MHFA 'as necessary to restore the capital reserve fund to an amount equal to the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on the bonds of the MHFA then outstanding.'

"This is not a bill aimed to clear blighted areas or to remove slums. There is no reference to a specific decadent area. . . . So far as we are aware, no decision of this court goes as far as would be necessary to uphold the bill. . . .
" . . . .
"A statute which reasonably faces and seeks to overcome the emergency stated in § 2 [of 1966 House Bill No. 3696], namely, that 'there exists in many cities and towns

376 Mass. 669                                        691

Massachusetts Home Mortgage Finance Agency v. New Eng. Merchants Nat'l Bank.

in the commonwealth a serious shortage of decent, safe, and sanitary housing available at low rentals to persons of low income,' could be for a public purpose. The difficulty is that the bill does not do this. Housing is to be furnished not merely to persons of low income but also to persons of 'moderate income,' . . . a term which is not defined. . . .

"....

"Thus, so far as the purpose of the bill is to provide housing for families of moderate income, the bill does not appear to be confined to a public purpose. The possibility that the rents paid by moderate income families, possibly up to seventy-five per cent in a project, will subsidize lower rents paid by low income families is too indirect and uncertain to enable us to say that expenditures of tax money under this bill will be for a public purpose." *Id.* at 726-728 (citations omitted).

Justice Kirk expressed the following significantly different view in a separate opinion on the constitutionality of 1966 House Bill No. 3696: "As I read the bill, its purpose is to make available public funds to assist private enterprise in providing decent, safe and sanitary housing, either by the construction of new or the rehabilitation of old dwellings, to persons of low income at low rentals, in an environment voluntarily to be shared, perhaps predominantly, by persons of moderate income on suitable terms, and thus, hopefully, to reduce slum areas and, in addition, to avert the blight and decadence which swiftly descend upon subsidized housing where the environment consists almost exclusively of a low level economic group. This purpose, in my judgment, in the context of our times, is a public purpose."[8] *Id.* at 729.

---

[8] Justice Kirk's views were truly prophetic. We have since witnessed the unfortunate consequences flowing from the concentration of large numbers of low income persons into certain public housing projects in Boston. Perhaps one of the best illustrations of the disastrous consequences inherent in such concentrations was the highly publicized Pruitt-Igoe public housing project in St. Louis, which has been razed.

The next occasion on which this court considered this same question was in *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank*, 356 Mass. 202 (1969). In that case, which was a procedural prototype of the present case, we were called on to determine the constitutionality of St. 1966, c. 708, as amended, which we said "resembles the bill (1966 House Bill No. 3696 ...) considered by the Justices in *Opinion of the Justices*, 351 Mass. 716 [1966]." 356 Mass. at 208. That statute created the Massachusetts Housing Finance Agency (MHFA), and provided in § 4(*a*) that the MHFA was authorized to make mortgage loans "to finance the building or rehabilitation of housing designed and planned to be available at low and moderate rentals for low income persons and families *and others*." See 356 Mass. at 203 n.3. The statute was described, as intending "to make available mortgage financing at favorable interest rates to housing projects in which, in general, one quarter of the tenants will be in the 'low income' category and the other tenants will be of moderate income." *Id.* at 209. There, as in the present case, the defendant banks argued "that the Act is not supported by any proper public purpose within ... the Constitution of the Commonwealth, at least to the extent that the Act affords rental benefits to families of moderate income." *Id.* at 208. This court seemed to be expressing the same concern when it said: "Despite the precautions taken in the Act to minimize benefits to tenants of moderate income, the question inevitably arises whether MHFA's lending (at lower than market interest rates) of money borrowed on tax exempt notes is for other than a public purpose because part of the housing and rent saving accrues to persons of moderate income not within the low income group usually regarded as suitable objects of public support." *Id.* at 210.

---

See *Minnesota Hous. Fin. Agency* v. *Hatfield*, 297 Minn. 155, 169-170 (1973).

The MHFA countered with the argument that the statutory scheme avoided undue concentration of low income tenants. It added that exposing such tenants to somewhat more affluent tenants who might maintain reasonable standards of property upkeep and thereby teach low income families how to take care of housing would help prevent tenant abuse and preserve the value of the entire project. The MHFA argued further that, although the lower mortgage interest rates on the projects which it helped finance meant that the families of moderate income paid rentals which were less than they would otherwise have to pay, the differential was necessary to induce those families to live in such projects and thereby accomplish the mixing of families of varied economic means. *Id.* at 211-212.

This court seemed to accept the argument by the MHFA, in part, when it said: "It is not for this court to consider whether these contentions are sound as a matter of economics and public policy. That is a legislative matter. Our duty is merely to consider whether the Legislature reasonably could consider them to be valid and could rationally regard the provisions of proper housing for low income families as the fundamental purpose of the Act and any benefits to persons of moderate income as only incidental to the primary objective, although contributing to its achievement. We are of opinion that the Legislature may properly enact legislation which proceeds on the basis of the considerations for which the MHFA contends." *Id.* at 212. After further discussion this court concluded "that the standards, expressly stated or implied in the Act, effectively require MHFA (a) to restrict loans under the Act to such projects as are of substantial benefit to low income persons and families; and (b) to make sure that any benefit to tenants not within the low income category will be at most incidental to, and no greater than is necessary for, achieving the Act's primary objective of proper housing in appropriate surroundings of persons of low income." *Id.* at 213-214.

In summary, the decision in *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank, supra,* appears to have reaffirmed the previous rule that, in order to qualify as a public purpose, public housing must have as its primary purpose the provision of housing for persons and families of low income, and that any benefits to persons and families other than those of low income may be tolerated only to the extent that they are incidental and necessary to the accomplishment of the primary purpose of relief to those of low income.

Notwithstanding the fact that in a number of the opinions and decisions discussed above we used language which the defendant now contends amounts to a holding that a statute which purports to benefit persons of moderate income in relation to housing is unconstitutional, we hold otherwise as to the MHMFA statute. We do so on a careful comparison of the statutes involved in earlier cases, and particularly the MHFA statute, with the MHMFA statute. It is true that the MHFA statute stated the express purpose of assisting persons of low income whereas the MHMFA statute states the purpose of assisting both low income and moderate income persons. That difference in expressed purposes is not alone decisive. What is decisive, in our opinion, is that, despite that difference, the definitions in the two statutes indicate that the classes of persons intended to be assisted thereunder are substantially the same. The comparative definitions are the following:

| *MHFA statute:* | *MHMFA statute:* |
|---|---|
| Section 1 (*d*): " 'low income persons or families' shall mean those persons or families whose annual income is less than the amount necessary to enable them to obtain and maintain decent, safe and sanitary housing without | Section 1: " 'Low income persons or families' [means] those persons and families whose annual income is equal to or less than the maximum amount which would make them eligible for units owned or leased by |

the expenditure of over twenty-five per cent of such income for basic shelter rent plus the additional cost, if any, of heat and hot water."

[No definition for "Moderate income persons or families."]

the housing authority in the city or town in which the residence for which the mortgage loan is sought is located or, in the event that there is no housing authority, that amount which is established . . . for low-rent units by the department of community affairs."

" 'Moderate income persons or families' [means] those persons and families whose annual income is less than the amount necessary to enable them to obtain and maintain decent, safe and sanitary housing without the expenditure of over twenty-five per cent of such income for housing expenses, including the provision of heat, electricity, hot water and an allowance for maintenance and repairs."

In our view, the persons included in the two income levels defined in the MHMFA statute, in combination, are substantially the same persons who would be included in the single definition in the MHFA statute. Having concluded that the purpose of the MHFA statute to help provide housing to those persons described as "low income persons or families" was a public purpose, we conclude that the purpose of the MHMFA to help provide housing to persons of the same level of income is a public purpose notwithstanding the fact that the latter statute

described them as persons of either low income or moderate income. The upper level of income of the persons entitled to be benefited under both statutes is substantially the same despite the slight difference in the statutory language.

There are decisions from other jurisdictions upholding statutes that authorize the use of public funds to provide housing without regard to the level of income of the persons who will benefit therefrom, and there are other decisions upholding statutes that authorize the use of public funds to provide housing for persons of "moderate income." We cite some of these cases, but, because of differences in the State Constitutions and the different meanings that may be ascribed to the words "moderate income" in such States, we do not attempt to discuss the decisions. *California Hous. Fin. Agency* v. *Elliott*, 17 Cal. 3d 575 (1976). *John R. Grubb, Inc.* v. *Iowa Hous. Fin. Auth.*, 255 N.W.2d 89 (Iowa 1977). *Minnesota Hous. Fin. Agency* v. *Hatfield*, 297 Minn. 155 (1937). *New Jersey Mortgage Fin. Agency* v. *McCrane*, 56 N.J. 414 (1970). *Johnson* v. *Pennsylvania Hous. Fin. Agency*, 453 Pa. 329 (1973). *Opinion to the Governor*, 112 R.I. 151 (1973). *Utah Hous. Fin. Agency* v. *Smart*, 561 P.2d 1052 (Utah 1977). *Vermont Home Mortgage Credit Agency* v. *Montpelier Nat'l Bank*, 128 Vt. 272 (1970). *State ex rel. West Virginia Hous. Dev. Fund* v. *Copenhaver*, 153 W. Va. 636 (1969). *State ex rel. Warren* v. *Nusbaum*, 59 Wis. 2d 391 (1973). For further discussion of this subject, see 80 Harv. L. Rev. 1811 (1967) and 84 Harv. L. Rev. 1921 (1971).

4. *Means by which public purpose is to be accomplished.* Some of the bank's arguments against the constitutionality of the MHMFA statute are directed at the wisdom or expediency of the means by which the Legislature chose to accomplish what we have held to be a public purpose. We have already noted in quoting from *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank*, that it is not for this court to consider whether the statute is sound as a matter of economics and public poli-

cy because that is a legislative matter. It is for the Legislature to determine the manner and means by which housing relief for persons of low and moderate income should be accomplished. In enacting the MHMFA statute it decided that relief should be accomplished by the several means already identified, viz., by loans to lenders, by participation in loans by lenders, and by neighborhood preservation programs, all designed to help persons become owners of residential property or repair and maintain property that might otherwise become substandard. In relieving the housing shortage the Legislature is not limited to any particular approach such as assisting in the financing of rental property.

Accordingly we reject the bank's argument to the effect that "the provision of mortgage loans in accordance with the Act [to persons of moderate income as well as those of low income] does not constitute a reasonable means of providing housing relief." That is a question for the decision of the Legislature, and it is not subject to judicial review. The same applies to the arguments (a) that, except in the case of neighborhood preservation programs, the Legislature has not required that mortgage loans or mortgage loan participation be limited to any particular area, and (b) that the MHMFA statute will allow mortgage loans for the acquisition of property that will remain exclusively private property, without restrictions except that the owner be an occupant and that if there are tenants there be a specified limit on rent increases.

The bank also points out that the MHMFA permits the Agency to designate a particular area as a neighborhood preservation area although it is not a slum or otherwise blighted area. That was a policy decision made by the Legislature. It is not open to this court to decide whether it would be better to wait until the area has become a slum or blighted area before something is done about the matter: the judicial department may not exercise these powers which belong to the legislative department. Art. 30 of the Declaration of Rights of the Massachusetts Constitution.

5. *Delegation of legislative authority to MHMFA.* The only remaining question which requires our attention is whether the authority which the Legislature has delegated to the MHMFA for the accomplishment of its intended purposes is unconstitutionally broad. "The standards for action to carry out a declared legislative policy may be found not only in the express provisions of a statute but also in its necessary implications. The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required. The Legislature may delegate to a board or officer the working out of the details of a policy adopted by the Legislature." *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 544 (1965).

The bank contends that the statutory language is not sufficiently precise to meet constitutional requirements for the delegation of legislative powers. We do not agree. It is possible that more precise language might have been included in the statute, but that is not the test. We have examined the statute, and particularly § 5 thereof, and hold that it is constitutionally adequate.

6. *Conclusion.* This action is to be transferred to the single justice sitting in and for the county of Suffolk for the entry of a final judgment that the MHMFA statute is constitutional and that the New England Merchants National Bank is obligated to purchase the notes of the MHMFA in accordance with its agreement dated February 27, 1978.

*So ordered.*