DONALD PELLETIER & another vs. CHICOPEE SAVINGS BANK.

Hampden.   November 17, 1986. — March 27, 1987.

Present: ARMSTRONG, PERRETTA, & SMITH, JJ.

*Consumer Protection Act,* Bank, Home inspection, Unfair act or practice.
*Bank. Mortgage,* Real property. *Real Property,* Mortgage.

A bank which made a home mortgage loan under the provisions of the
statute establishing the Massachusetts Home Mortgage Finance Agency
and the regulations promulgated thereunder was not required to provide
the buyers with an appraisal report of a nature that would have revealed
a structural defect prior to their purchase of the property. [710-713]
At the trial of a claim by home buyers under G. L. c. 93A, the Consumer
Protection Act, the evidence amply supported the judge's conclusions
that the defendant bank, in acting on the plaintiff's application for a
home mortgage loan, had done nothing to mislead the plaintiffs as to
the structural condition of the premises nor made any misrepresentation
which could have misled them into waiving their right under their pur-
chase and sale agreement to obtain a physical inspection by a consultant
of their own choice. [714-715]

CIVIL ACTION commenced in the Superior Court Department
on February 6, 1984.

The case was heard by *William W. Simons,* J.

*Frank R. Saia* for the plaintiffs.

*Thomas G. Costello* for the defendant.

PERRETTA, J. When the plaintiffs (husband and wife) applied
for a Massachusetts Home Mortgage Finance Agency
(MHMFA) loan from the defendant bank, the bank's loan
interviewer told them that a termite inspection report and a
real estate valuation report would be required, that these reports
would be prepared by independent companies (not employees
of the bank) at the plaintiffs' expense, and that the bank would
"take care of everything." The appraisal report, which the
plaintiffs never asked about or requested to review, excluded

by its very terms any valuation based upon structural conditions of the building. After moving into the house, the plaintiffs discovered a serious structural defect. They brought an action against the bank[1] under G. L. c. 93A, on the theories that St. 1974, c. 846, as amended by St. 1977, c. 561 (the MHMFA statute), and regulations promulgated thereunder, require the bank to guarantee that appraisers inspect for structural defects and that because of the loan interviewer's assurance to them that the bank would "take care of everything," the bank had a duty either to obtain a structural inspection or to advise the plaintiffs that the valuation report did not include such an inspection. The trial judge concluded that the bank had done nothing unfair or deceptive and ordered judgment for the bank. We affirm.

I. FACTS.

On November 10, 1982, the plaintiffs, in response to an advertisement in a local newspaper, went with a real estate broker to the property in question and viewed the premises. Thereafter, on November 15, 1982, they entered into a purchase and sale agreement with the sellers. Under the terms of that agreement, the plaintiffs had the right to obtain a home inspection at their own expense within ten days of the date of the agreement, and, if the results were not satisfactory, they could cancel the agreement.

Three days later, on November 18, 1982, the real estate broker and the plaintiffs went to the bank to apply for a MHMFA mortgage loan. They met with the loan interviewer, who advised them of the need for a termite inspection report and a real estate valuation report. Both reports, he explained, would be prepared by independent companies and paid for by the plaintiffs.

---

[1] The plaintiffs also named the sellers, the real estate broker, the exterminating company and the appraisal firm as defendants. The action against the sellers was discontinued prior to trial, and the exterminating company's motion for a directed verdict was allowed at the close of the plaintiffs' case. The action against the appraisal firm was settled during trial for the sum of $2,000. The real estate broker also settled during trial by purchasing the property for the full amount of the purchase price paid by the plaintiffs plus the sum of $2,000. Both settlements were entered into with the stipulation that they were made without admission of any wrongdoing or liability on the part of those defendants.

Whether the loan interviewer in fact told the plaintiffs that the bank would "take care of everything" was disputed at trial. There is no express finding by the trial judge that the statement, which he characterized as "equivocal," was or was not made. In any event, neither his conclusions nor our decision turns on that point.

As described by the judge, the plaintiffs are young (mid-twenties), "relatively unsophisticated" and without experience in either "home ownership or the purchase and sale of real estate." Although each has a ninth-grade education and neither suffers from any type of "disability," legal documents "are beyond their comprehension." The husband is only able to read and write "nominally." At the bank, the husband relied upon the wife's ability to read and did not convey to anyone at the bank his "inability to understand the written word."

II. DISCUSSION.

"Just as every lawful act is not thereby automatically free from scrutiny as to its unfairness under c. 93A (see *Schubach* v. *Household Fin. Corp.,* 375 Mass. 133, 137-138 [1978]), so not every unlawful act is automatically an unfair (or deceptive) one under G. L. c. 93A." *Mechanics Natl. Bank* v. *Killeen,* 377 Mass. 100, 109 (1979). We analyze first the plaintiffs' claim that the bank did not comply with the MHMFA statute and regulations promulgated thereunder.

A. *The statute and regulations.* The Massachusetts Home Mortgage Finance Agency was created by St. 1974, c. 846, as amended by St. 1977, c. 561, in order to "promote the expansion of the supply of funds at low interest rates available for new residential mortgages for persons and families of low income and those of moderate income and thereby to help alleviate the shortage of adequate housing for such persons and families." *Massachusetts Home Mortgage Fin. Agency* v. *New England Merchants Natl. Bank,* 376 Mass. 669, 671 (1978). The MHMFA's power to adopt regulations to carry out the purposes of the statute is found in § 4(*p*).

Although the statute manifests its purpose as one of making suitable housing available to families of low and moderate income, the means by which that purpose is to be implemented and carried out, including the use of funds for construction

and rehabilitation, are expressed in rather general terms. But no matter how generously we construe the statute, we see nothing in its provisions to support the plaintiffs' claim that the bank was under a statutory duty to provide them with technical assistance of a nature that would have revealed the structural defect prior to their purchase of the property.[2] We, therefore, look next to the regulations.

When a MHMFA loan is sought, the property must be appraised in accordance with guidelines found in 761 Code Mass. Regs. §§ 21.51 through 21.56 (1979). The primary purpose of the appraisal is explained in § 21.55, which reads: "The basic question to be answered by property appraisals is if the Borrower fails to repay the Mortgage Loan, can the Seller [the bank], in the future, sell the structure for a price equal to the amount of the unpaid Mortgage Loan." By the terms of the purchase and sale agreement, the plaintiffs had agreed to pay $25,900 for the property.[3] As determined by the appraiser, the fair market value of the property was $30,000.

In appraising the property and reporting its value to the bank, the appraiser used a standard Federal National Mortgage Association (FNMA) form, as permitted by the MHMFA under § 21.51, *supra*. As stated by the trial judge, the report "by its own terms excludes any valuation based on structural condi-

---

[2] Section 4(*k*) authorizes the MHMFA to "[p]rovide technical assistance to potential borrowers from mortgage lenders, subject to the provisions of section seven." However, any obligation to give technical assistance to borrowers which is imposed by § 7 is upon the MHMFA and not the bank. As here pertinent, § 7 reads: "MHMFA may, subject to appropriation by the general court or funds made available from any other public or private source, and pursuant to rules and regulations adopted by it, contract with nonprofit organizations incorporated under the laws of the commonwealth or qualified public agencies for technical assistance to potential borrowers from such mortgage lenders including without limitation the following services: (*i*) consultation as to the nature, extent and manner of new construction, or the repair, remodeling or rehabilitation financed hereunder and consultation regarding the nature, extent and manner of repairs required to ensure that the dwelling structure shall not contain a substantial violation of the housing or building codes after such work is completed."

[3] The plaintiffs made a $500 deposit at the time they signed the purchase and sale agreement. They sought a mortgage loan in the amount of $24,600.

tions of the building." Because the parties have not provided us with a copy of the report in its entirety, we do not know the terms of the exclusion, nor do we know whether those terms are stated in the FNMA form itself (and, hence, impliedly allowed by the MHMFA under § 21.51) or were added by the appraiser so as to be of potential relevance to the plaintiffs' claim.

Assuming the exclusion of the structural condition of the building from the valuation report to have been an individual decision made by the appraiser, we think that his omission here lacks significance. In so concluding, we are not unmindful of the appraisal guidelines set out at 761 Code Mass. Regs. § 21.51 through § 21.56, especially § 21.56. The first paragraph of that section reads, in full:

> "The property valuation will be based on the structural condition of the property and comparable values of similar structures. The value may be determined by several factors: the market method which compares the sales price of similar properties; the income method which bases value on the income produced by the property; the replacement method which sets the value at the replacement cost of the house. Each of the methods will be used cautiously and with the objective of improving the housing market in urban areas."

Neither § 19.02 nor § 21.03, of title 761, *supra,* defines the term "structural condition" as it is used in the appraisal guidelines promulgated by the MHMFA. On its face, the first paragraph of § 21.56 does not require more than that the appraiser consider the structural condition of the building in a broad sense, taking into account its location and physical characteristics (e.g., age, design, construction, material, and apparent degree of upkeep or maintenance) in order to determine its market value by comparing it to recently sold similar properties. Such a reading of § 21.56 is supported not only by the express language used therein but also by § 21.55.

There is no suggestion that the appraiser did not consider the structural condition of the building in this sense in valuing

the property by use of the market method. Nor does it appear to be here suggested (see note 1, *supra*) that the structural defect in question[4] necessarily would have been discovered by the appraiser in the course of preparing his report in accordance with § 21.56, *supra*.

In arguing that they were entitled to a "structural mechanical inspection," the plaintiffs make no mention of (and, therefore, place no reliance upon) § 21.56. Further, nowhere in their brief do the plaintiffs offer a definition of the phrase "structural mechanical inspection." However, they appear to be claiming that the structural integrity of the building should have been determined in accordance with engineering principles. Even had the plaintiffs relied upon § 21.56 in making this argument, as we have construed § 21.56, that appraisal guideline does not support their claim.

Although none of the MHMFA's regulations requires a "structural mechanical inspection,"[5] the plaintiffs rely upon § 21.53 to argue that under that regulation, the bank should have required the appraiser to perform such an inspection. Just a casual reading of that portion of § 21.53 upon which the plaintiffs rely ("It is the responsibility of the . . . [bank] to insure that appraisers are aware of and utilize these guidelines [§ 21.51 through § 21.56] in appraising Mortgage Loans in which Loan Participations are purchased by MHMFA") proves the contention to be no more than bootstrapping. Moreover, the argument fails to take into account the primary purpose of the appraisal report as set out in § 21.55.

It follows from what we have said that the bank complied in all respects with the MHMFA statute and regulations.[6]

---

[4] As described by the plaintiffs in their complaint as it related to the sellers, see note 1, *supra,* the floor was structurally deficient but this condition "was not susceptible of easy visual discovery by the unsuspecting plaintiffs due to the arrangement of household furnishings . . . designed to deceive" them.

[5] In their belief, the plaintiffs state that the authorized forms used by the appraiser and accepted by the bank "were not intended to give a structural analysis of the property."

[6] We need not and specifically do not consider whether, because of the primary purpose of the appraisal report as set out in § 21.55, *supra,* a

B. *Unfairness.* Having concluded that the bank did nothing unlawful, we consider next whether it did anything unfair under G. L. c. 93A, § 2. See *Penney* v. *First Natl. Bank,* 385 Mass. 715, 719-720 (1982). Here the plaintiffs focus on the statement of the loan interviewer that the bank would "take care of everything" as creating an obligation on the part of the bank to obtain a structural mechanical inspection or to advise the plaintiffs that such an inspection would not be done. The trial judge characterized the loan interviewer's statement, if made, as "equivocal." He "specifically f[ou]nd that there was no effort made by the defendant bank to mislead the plaintiffs with regard to the physical condition of the home, nor was there any misrepresentation on the bank's part in misleading the plaintiffs into waiving their right to obtain a physical inspection by a consultant of their own choice as was their right under the [purchase and sale] agreement." The evidence with which we have been provided gives ample support to the trial judge's findings.

Although unable to "understand the written word," the husband did not reveal that fact to the loan interviewer and instead chose to rely upon his wife's ability to read. There is nothing in those portions of the transcript with which we have been provided to show that the plaintiffs made any inquiry prior to the appraisal about the scope and intent of any inspection to be done, nor did they ever ask to see the report once it had been completed. The purchase and sale agreement speaks in terms of a "home inspection," and there is, therefore, nothing in that document which, if seen by the loan interviewer, would have put him on notice of the fact that the plaintiffs reasonably could have specific expectations which the bank did not intend to meet. Further, even assuming that the plaintiffs' lack of sophistication in legal and real estate matters was readily apparent to the loan interviewer, we find nothing in evidence which

MHMFA borrower never could have a claim against a bank based upon a failure to obtain an adequate appraisal report. See and compare *Danca* v. *Taunton Sav. Bank,* 385 Mass. 1, 7 (1982), with *Page* v. *Frazier,* 388 Mass. 55, 66-67 (1983).

suggests exploitation of their naiveté. See generally *Page* v. *Frazier,* 388 Mass. 55 (1983), and specifically, 64 & 67, citing *Rae* v. *Air-Speed, Inc.,* 386 Mass. 187, 193 (1982). Compare *Danca* v. *Taunton Sav. Bank,* 385 Mass. at 4-9.

*Judgment affirmed.*